WITNESS: Farley Kaufmann

SHEET 1

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MINNESOTA
 3    ---------------------------------------------
 4    PATRICIA A. DARKE,
 5          Plaintiff,
 6
 7      -vs-        Civil File No. 06-996(PJS/RLE)
 8    LURIE BESIKOF LAPIDUS &
 9    COMPANY, LLP,
10          Defendant.
11    ---------------------------------------------
12
13                   DEPOSITION OF
14                  FARLEY KAUFMANN
15                   MARCH 6, 2007
16                    9:00 A.M.
17
18
19          MARY PIERSON BRIMMER, RPR
              PIERSON REPORTING
          VOICE: 952-233-1944  FAX: 952-496-3325
20            Mary.Pierson@comcast.net
```

**Page 2**

```
 1                   APPEARANCES
 2    FOR THE PLAINTIFF:
 3       THOMAS E. GLENNON
            Attorney at Law
 4       THOMAS E. GLENNON & ASSOCIATES, P.A.
            4700 Wells Fargo Center
 5          90 South Seventh Street
            Minneapolis, Minnesota 55402
 6
 7    ALSO PRESENT: Patricia A. Darke
 8
 9    FOR THE DEFENDANT:
10       DONNA L. ROBACK
            Attorney at Law
11       DONNA L. ROBACK, P.A.
            5200 Willson Road
12          Suite 150
            Edina, Minnesota 55424
13
17       The Original is in the possession of
            Attorney Thomas E. Glennon.
20              * * * * *
```

**Page 3**

```
 1                      INDEX
 2   EXAMINATION:
 3   By Mr. Glennon - Pages 5, 210
 4   By Ms. Roback - Page 209
 5
 6   DEFENDANT'S EXHIBITS:              PAGE MARKED:
 7   1 - Handwritten sheet, "Expected Comp"........ 79
 8   2 - Letter, Skinner to Darke, 6/6/00,
         PD 0484 - 0485............................ 90
 9
10   3 - Exhibit III, Licensee's
         Employee/Associate Agreement,
         PD 0486 - 0488............................ 97
11
     4 - Handwritten sheet, "Currently P Darke"....166
12
     5 - E-mail, Darke to Kaufmann,
13       Subject: Year End.........................181
14   6 - Memo, Partnership Committee to Darke,
         5/17/04, RE: Request for Increase
15       in Compensation Structure.................181
16   7 - Recruitment, Intranet.....................181
17   8 - E-mail, Darke to Cornman, 4/11/05,
         Subject: Meeting..........................181
18
     9 - E-mail, Darke to Cornman,
19       Subject: Clarification....................181
20   10 - E-mail, Darke to Cornman, 4/28/05,
         Subject: Re:Clarification.................181
21
     11 - E-mail, Darke to Cornman,
22       Subject: 4/28/05..........................181
23   12 - Letter, Darke to Farley, 5/16/05.........181
24   13 - Letter, Kaufmann to Darke, 5/17/05.......181
25   14 - Memo, Kaufmann to Darke, 5/25/05,
          RE: Resignation..........................181
```

**Page 4**

```
 1   DEFENDANT'S EXHIBITS: (Continued)   PAGE MARKED:
 2   15 - Defendant's Answers To Plaintiff's
          Interrogatories (First Set)..............181
 3
     16 - Defendant's Responses to Plaintiff's
 4       Request For Production Of Documents
         And Things (First Set)....................181
```

EXHIBIT 2

**13**

1  Q. Why don't we, then, get a little background on the
2  firm. What is its business or what are its businesses?
3  A. First we're a CPA and consulting firm. We do tax
4  work. We have a small private investment banking division.
5  We have a technology consulting division.
6      I guess the investment banking division may even be
7  a subsidiary legally.
8      We have a leadership group. We have an actuarial
9  group which is part of a larger employee benefits group.
10  Q. How many total employees are there of the firm?
11  A. Ballpark, 130.
12  Q. And again, just for general background, you
13  mentioned a CPA and consulting. What is the nature of that
14  work, sir, again for the benefit of our record and the benefit
15  of laypersons?
16  A. What is the nature of what?
17  Q. CPA and consulting function which you described the
18  firm as performing.
19  A. Okay. CPA function, it can involve many different
20  things. For one, they're the only ones that are really
21  authorized to sign audit reports or review reports, so the
22  attest function falls only with CPAs.
23      And the consulting partners, we're just general
24  business consultants to many clients.
25  Q. Then you indicated the firm performs tax services?

**14**

1  A. Yes.
2  Q. What are those, sir? Just describe those for our
3  record, please.
4  A. We prepare business and individual tax returns.
5  Q. And you talked about private investment which might
6  be a division of the firm. What is that, sir?
7  A. Private investment banking is what I mentioned, and
8  that is an area where we have an investment banker with a
9  broker/dealer license who represents businesses who want to
10  sell.
11  Q. Technology consultant, please describe those
12  services.
13  A. The majority of their work is disaster recovery
14  planning work and security work, technology area.
15  Q. Then you identified the leadership group. What is
16  that, sir?
17  A. It's a group that uses the Predictive Index as its
18  backbone and the firm has a license to that product or service
19  and with that they have developed coaching, counseling,
20  hiring. They train people within our client base that use PI.
21  Q. We'll come back to that in just a moment after we
22  finish off the remaining functions.
23      You described also an actuarial group.
24  A. They work on defined benefit retirement plans.
25  Q. All right. Let's go back to the leadership group if

**15**

1  we could, sir.
2  Q. How many persons are employed in that group with the
3  firm?
4  A. Three.
5  Q. And who are they, sir?
6  A. Mary Rose Iten, Laura Prieve, and Jean Laplant.
7  Q. Do they have titles within the firm?
8  A. One of them does.
9  Q. Who is that?
10  A. Mary Rose Iten.
11  Q. What is her title?
12  A. You know, I might be speaking out of school. I'm
13  not absolutely certain she's the president right now. I would
14  have to look to see if she was given that title or not.
15  Q. So you don't know whether or not she is the
16  president or what her title is?
17  A. I don't remember right now.
18  Q. And then you mentioned two others. Jean, does she
19  have a title?
20  A. No.
21  Q. What is her position?
22  A. Administrative assistant.
23  Q. And the third person in the leadership group?
24  A. Laura Prieve, she's the number two person in the
25  professional staff. She does training, has some

**16**

1  responsibilities to sell.
2  Q. What does Mary Rose Iten do in her function?
3  A. Mary Rose Iten is really the lead salesperson.
4      Included in that is really consulting with the
5  client base, helping maintain client relationships and then
6  selling.
7  Q. When was she employed by the firm?
8  A. Months after Patty left.
9  Q. Has she assumed any of the functions or duties of
10  Ms. Darke which she performed while she worked at the firm?
11  A. In some capacity, yes.
12  Q. In what capacities?
13  A. She's responsible for sales, and she's kind of the
14  head strategist on trying to grow that area, reporting through
15  me to the executive committee.
16  Q. Are there functions or duties which Ms. Darke
17  performed that Mary Rose Iten has not assumed or does not
18  perform?
19  A. None that I can think of.
20  Q. Are there any duties or functions which Ms. Darke
21  performed which are performed by any other person or employee
22  of the firm?
23  A. No.
24  Q. How is Mary Rose Iten compensated? Is she on a
25  salary? Is she on a salary plus commission, or what do you

**17**

1  understand of her compensation basis?
2  A. She has a salary and a percentage of department
3  revenue in excess of a certain amount.
4  Q. We have, as your attorney may have indicated to you,
5  a protective order entered in this case to guard the parties'
6  confidential or business or proprietary information, so I want
7  to let you know about that. And at any time, if any portion
8  of our discussion today should be separately designated as
9  confidential, she, of course, is able to do so, and I'm
10 assuming that she would do so.
11      But I do want you to know that all of the
12 information that you will be providing today, we will
13 consider -- the plaintiff will consider to be subject to that
14 confidentiality order and will not be used for any purpose not
15 permitted by that order, just to give you assurance about some
16 of the matters, the sensitivity of some of the matters that we
17 may be discussing today.
18      THE WITNESS: Okay.
19      MS. ROBACK: Mr. Glennon, what I would
20 like to do is have the opportunity, once there is a transcript
21 and we read and sign, to be able to go back and designate some
22 portions confidential if we so believe, obviously, without
23 overstating it, but just in case there is something that
24 hasn't been noted as we're doing the deposition.
25      MR. GLENNON: I am quite satisfied with

**18**

1  that. We'll want to let the court reporter know how it is
2  that she should go about the physical preparation of the
3  transcript today, if it should be delivered in a sealed
4  envelope to each of us, however you would like to do that,
5  please.
6       MS. ROBACK: We'll try to, as much as we
7  can do it today, but I would like the opportunity that if
8  there are portions when we read and sign.
9  BY MR. GLENNON:
10 Q. We're talking about Mary Rose Iten and you described
11 her compensation basis.
12      Has her compensation basis changed since she joined
13 the firm?
14 A. I don't think so.
15 Q. What is her salary that she is paid at present?
16 A. Give or plus 5,000?
17 Q. If you need to, please so indicate.
18 A. Okay. $80,000.
19 Q. Do you know whether or not she started at that
20 salary?
21 A. She did.
22 Q. Then you indicated that she is also eligible to
23 receive a percentage of department revenue in excess of a
24 certain number. What is that, sir?
25 A. There's a base revenue number that she needs to

**19**

1  exceed which is really to cover her salary. I'm not sure if
2  it's 550 or 600.
3  Q. And she shares in some percentage above 550,000 or
4  600,000 of revenues?
5  A. Yes, she does.
6  Q. What is the percentage that she receives above that
7  threshold figure?
8  A. 20 percent, I believe.
9  Q. Do you know whether or not that's the same as when
10 she began her employment?
11 A. Yes.
12 Q. Is any of her salary subject to repayment if she
13 does not reach a certain level of sales revenues?
14 A. No.
15 Q. Say it again, please.
16 A. No.
17 Q. Okay. Thank you.
18      Were you involved in her hiring?
19 A. Yes.
20 Q. What role did you have in her hiring?
21 A. I'm one of the partners that interviewed her.
22 Q. Who else interviewed her?
23 A. Beth Leonard, and I don't recall if there were
24 others. There may have been.
25 Q. Was an advertisement placed?

**20**

1  A. I believe so.
2  Q. Do you know what the advertisement said or what
3  position it sought?
4  A. No, I do not.
5  Q. Do you recall what she was told concerning the
6  position that she may be hired for?
7  A. I can only say what I told her. I cannot say what
8  Beth might have told her because I wasn't there. But the job
9  was explained to her as I explained it to you earlier.
10 Q. So you told her that she was being hired to head the
11 leadership group?
12 A. I told her she was the -- yeah, probably did tell
13 her that.
14 Q. What else did you tell her?
15 A. That we had a partner temporarily filling in trying
16 to keep the department running and that she would have sales
17 responsibilities, client relationship responsibilities, some
18 training responsibilities, and the main focus to begin with
19 would be to check in with our client base to see how they were
20 doing because we were losing a lot of clients because they
21 said they were underserved during the last year that Ms. Darke
22 was with us.
23 Q. Who was the partner that was temporarily filling in?
24 A. Marshall Lehman.
25 Q. When did you meet with Mary Rose Iten for the first

**Page 21**

1 time?
2   A. I don't recall.
3   Q. Was Ms. Darke still employed at the firm when you
4 did?
5   A. I don't believe so.
6   Q. So you believe the first contact that you had with
7 her was after Ms. Darke had left the firm?
8   A. I believe so, but I'm not certain on the dates.
9   Q. And concerning any advertisement for this
10 position -- did she respond to an advertisement; do you
11 recall?
12   A. Yes.
13   Q. Who prepared that advertisement?
14   A. HR.
15   Q. Who would that be?
16   A. Probably Greg Cornman.
17   Q. And you don't recall any of the contents of the
18 advertisement which was placed?
19   A. I may have read it, I may not have read it.
20   Q. As you sit here today, you don't recall any of its
21 contents?
22   A. I do not.
23   Q. Do you know when the advertisement was first run?
24   A. No, I don't.
25   Q. Do you know when the advertisement was prepared?

**Page 22**

1   A. No, I don't.
2   Q. You indicated that you interviewed Mary Rose Iten
3 and that Ms. Leonard did. You don't know if anybody else
4 interviewed her?
5   A. I don't recall.
6   Q. You met with her separately from Ms. Leonard or did
7 you meet together?
8   A. I think we met her separately.
9   Q. Did you meet her on one occasion or more than one
10 occasion?
11   A. I really don't recall.
12   Q. Did you speak with her on the phone or have any
13 other contact with her other than your face-to-face interview
14 of her?
15   A. I don't believe so.
16   Q. Do you know what period of time lapsed between the
17 time the advertisement was prepared and the offer of
18 employment which was extended to her?
19   A. Not exactly.
20   Q. How about approximately?
21   A. I would be guessing.
22   Q. Do you know if it was weeks or months or days?
23   A. Not days.
24   Q. So you believe at least weeks?
25   A. Yes.

**Page 23**

1   Q. Do you know whether or not a month passed between
2 the time the advertisement was prepared --
3       MS. ROBACK: I'm going to object as
4 speculative. He said he doesn't recall.
5 BY MR. GLENNON:
6   Q. No recollection at all?
7   A. None.
8   Q. How about the time between the time that you met her
9 and the time that an offer of employment was extended to her?
10   A. I don't recall.
11   Q. How soon did she begin employment following your
12 meeting with her?
13   A. I'm sorry, I don't recall.
14   Q. Was there a hiring for a trainer position -- or
15 excuse me.
16       Was there an advertisement placed or was there an
17 effort sought to find a trainer for someone more devoted to
18 those functions, heading the department functions?
19   A. I'm sorry, while who was heading the department
20 functions?
21   Q. Maybe either I misstated the question or maybe it
22 was misunderstood. Let me begin again.
23       Was there an effort made to find a person to hire
24 for a training role in the spring of 2005?
25   A. While Miss Darke was still with the firm, we were

**Page 24**

1 trying to decide whether to hire a training position or
2 another position like Ms. Darke's but starting a person at a
3 lower level.
4   Q. Do you know whether or not an advertisement was
5 placed or interviews were ever had of any person for a
6 training position?
7   A. I don't recall.
8   Q. Do you recall any person other than Mary Rose Iten
9 interviewing for any position in the leadership group in the
10 first half of 2005?
11   A. In the first half of 2005. No, I'm not even sure if
12 Mary Rose Iten interviewed in the first half of 2005.
13   Q. So you're not aware of anybody, other than the
14 possible exception of her, that did interview for a position
15 in the leadership group in the first half of 2005?
16   A. I am uncertain.
17   Q. Do you know whether or not Mr. Cornman met Mary Rose
18 Iten in any interview or preemployment process?
19   A. I do not know.
20   Q. In your discussion with Mary Rose Iten, did you
21 discuss Ms. Darke?
22   A. I don't recall.
23   Q. Was there any discussion about the functions which
24 Ms. Darke performed in the leadership group?
25   A. There were functions discussed that Mary Rose Iten

**25**

1  would perform which may be similar to what Ms. Darke was
2  performing, but they were not discussed in the nature of
3  Ms. Darke's performance.
4     Q. Did you indicate that the firm was losing Ms. Darke
5  as an employee and hence this position needed to be filled?
6     A. I'm not certain, but I think Ms. Darke might have
7  been gone when we interviewed Mary Rose.
8     Q. Did you indicate that there was a need to fill the
9  position because of Ms. Darke's actual or imminent departure?
10    A. Again, I'm not sure of the timing when I interviewed
11 Mary Rose, so I don't know if I said the position was
12 imminently going to leave -- actually, I didn't know the
13 position was empty until the day Ms. Darke resigned, so, no, I
14 would not have made a comment that it was going to be a
15 position because Ms. Darke was leaving.
16    Q. Does this help you recall whether or not Ms. Darke
17 was still employed by the firm as of the time you interviewed
18 Mary Rose Iten?
19    A. No, it does not help me.
20    Q. You still don't know whether or not you interviewed
21 her while Ms. Darke was an employee of the firm?
22        MS. ROBACK: I'm going to object as asked
23 and answered.
24        If you want to reanswer.
25

**26**

1  BY MR. GLENNON:
2     Q. I just want to make sure from your answer, sir, that
3  I'm understanding what you're saying. You don't recall
4  whether or not Ms. Darke was employed at the firm at the
5  time --
6     A. I am not certain.
7     Q. And so to the best of your recollection, was there
8  any discussion about whether or not this was an open position
9  that somebody else had previously held or whether it was a new
10 position?
11    A. You know, I'm not certain of that.
12    Q. Is Mary Rose Iten a director?
13    A. No, she's not.
14    Q. Has she been presented any documents to sign
15 reflecting any agreement with the firm?
16    A. I'm certain HR has had her sign the normal documents
17 that all of our employees sign.
18    Q. Just the ordinary and usual human resource
19 documents?
20    A. I believe so.
21    Q. How about with respect to any agreements either
22 restricting post-employment activities or otherwise, are you
23 aware of any such agreements that she has been asked to sign
24 with the firm?
25    A. Well, she signed one with our home office.

**27**

1     Q. What does that mean?
2     A. Praendex, which is located in Boston, has to approve
3  the employees that we as a licensee hire, and after they do
4  that, then they require our employee to agree to an agreement
5  with them.
6     Q. You said "home office." Does the firm have any --
7  other than a license agreement, does the firm have any other
8  ownership or other interest in Praendex?
9     A. No, we do not.
10    Q. Now, I had asked you a moment ago about director's
11 agreements. You're familiar with those, sir?
12    A. I am familiar with those, but I don't recall you
13 asking me about them.
14    Q. I had asked about any agreements that had been
15 presented to Mary Rose Iten. I had asked whether she was a
16 director. Maybe I just assumed that there would be a
17 connection in your mind about that.
18        She has not signed a director's agreement?
19    A. No, she's not.
20    Q. How many directors of the firm are there, sir?
21    A. I don't recall off the top of my head.
22    Q. And again, for the benefit of our record, directors
23 are different from partners, is that right, sir?
24    A. Yes.
25    Q. Partners are owners of the firm; is that right?

**28**

1     A. Correct.
2     Q. Are directors owners of the firm?
3     A. No, they are not.
4     Q. Can you describe for our record what directors do or
5  persons who are designated as directors, how in the firm
6  hierarchy that's of any meaning or significance?
7     A. Sure. They're usually staff which, you know, we
8  could hire direct or are coming at that manager level of our
9  firm who have distinguished themselves as being a very
10 valuable employee and somebody who is either at the top of
11 their technical area of expertise or who has -- just making a
12 large contribution to the firm, and we then present them with
13 that opportunity to become a director and they sign the
14 director's agreement.
15    Q. And what, generally speaking, does the director's
16 agreement attempt to cover?
17    A. Really three things. One is to distinguish them;
18 two is to give them a benefit after retirement, deferred
19 compensation; and three, a noncompete provision.
20    Q. Has the director's agreement changed over the years,
21 sir?
22    A. Not much, if any.
23    Q. Do you know how long the firm has had director's
24 agreements?
25    A. No, I don't.

**29**

1  Q.  Approximately?
2  A.  Longer than ten years.
3  Q.  During all of your tenure as managing partner or
4  not?
5  A.  I don't recall.
6  Q.  Did you play any role in the adoption or the terms
7  to be included within director's agreements of the firm?
8  A.  Well, I certainly did for the ones that were signed.
9  Q.  What do you mean by that?
10 A.  For the people that became directors while I was the
11 managing partner, I would direct either admin, Mary Franklin,
12 or HR, when we had a talented HR person -- we had some
13 turnover at HR -- and one of them would draft the agreement.
14 Q.  And I'm sorry?
15 A.  One of them would be drafting the agreement.
16 Q.  Are all partners also directors?
17 A.  No.
18 Q.  Do partners -- are partners subject to a noncompete
19 agreement?
20 A.  Yes.
21 Q.  Is that in the partnership agreement?
22 A.  Yes.
23 Q.  Are any partners directors?
24 A.  No.
25 Q.  So director's agreements, then, are presented only

**30**

1  to nonpartner members of the firm, or employees of the firm,
2  who have met the criteria which you described?
3  A.  Correct, correct.
4  Q.  Employees are not asked to sign noncompete
5  agreements at the commencement of employment with the firm, is
6  that right, sir?
7  A.  That is correct.
8  Q.  Maybe this would also be a good time for you to
9  identify, for the benefit of our record, persons who have
10 performed in certain functions.  Let's say from 2000 forward,
11 who is the current head of HR at the firm?
12 A.  Current is Greg Cornman.
13 Q.  Do you know how long Mr. Cornman has occupied that
14 position?
15 A.  Probably one to two years.
16 Q.  Was he previously employed by the firm or did he
17 come from outside the firm?
18 A.  He came from outside.
19 Q.  Who preceded -- and what is his title?
20 A.  HR manager.  I'm guessing.  I'm not really certain
21 if he has a formal title.
22 Q.  Who is the person who preceded Mr. Cornman in that
23 position, sir?
24 A.  I don't recall because we had a lot of turnover in
25 the ordering of the people.  So I wouldn't want to perjure

**31**

1  myself.
2  Q.  I wouldn't want you to do that either.
3  A.  Okay.
4  Q.  Do you remember anyone who preceded Mr. Cornman in
5  that position?
6  A.  Sure.  That would be easier.  Thank you.
7      Tiffany Walz, Clair Pitera.
8      I guess I don't remember the other names.  If you
9  have some names you want to ask me, I probably could remember.
10 Q.  Well, let's work for right now with the ones that
11 you can recall.
12 A.  All right.
13 Q.  Do you remember when Ms. Walz was in that position?
14 A.  I don't.
15 Q.  Do you know if she was before or after Clair Pitera?
16 A.  That's where I'm hazy.
17 Q.  And then there's also an administrator position, is
18 that right, sir?
19 A.  For administrator?
20 Q.  Yes.
21 A.  Yes, there is.
22 Q.  Who presently occupies that position?
23 A.  No one.
24 Q.  Who was the last person to occupy that position?
25 A.  Mary Franklin.

**32**

1  Q.  Do you know how long she held that position?
2  A.  Approximately ten years.
3  Q.  Why is no one currently occupying that position?
4  A.  You'll have to ask the director -- the partner in
5  charge of HR.
6  Q.  Who is that?
7  A.  Beth Leonard.
8  Q.  Do you know whether or not there's been a decision
9  made not to fill that position?
10 A.  I know there's not been a decision to not fill it.
11 Q.  Who is the partner in charge -- is Ms. Leonard then,
12 as the partner in charge of HR, would she be responsible both
13 for the firm administrator position and the HR manager
14 position?
15 A.  What do you mean "responsible for"?
16 Q.  Is there a reporting relationship or does she
17 oversee any of the duties or functions?
18 A.  HR.
19 Q.  Would that include Mr. Cornman?
20 A.  Yes.
21 Q.  Does Mr. Cornman report to her?
22 A.  I believe so.
23 Q.  How long has Ms. Leonard been the partner in charge
24 of the HR function?
25 A.  Two to three years.

### Page 37

 1   part of the business of the firm?
 2      A. The only thing I know about that is I think it was
 3   back in the 1940s, maybe the 1950s, before I was born that the
 4   firm got the license for that. At least I think it was that
 5   long ago. Long before I was involved in the firm.
 6      Q. And this tool is a part of the leadership group
 7   responsibilities?
 8      A. Yes.
 9      Q. And again, thank you for your description.
10          As far as what the tool is designed to do, the firm
11   has had some -- a business of some duration with Praendex or
12   its predecessor concerning this license?
13      A. For many years, we had the license but we were
14   probably the only client. We used it on ourselves. I really
15   don't recall if there was much of a business there before
16   Randy Vick joined the firm. I don't recall. That would be
17   pre-me, as far as being managing partner.
18      Q. So at the time that you assumed your functions as
19   managing partner, which I gather from your description would
20   be the early 1990s --
21      A. Correct.
22      Q. -- was the Predictive Index tool used for employees
23   or on employees of the firm?
24      A. It was used in the hiring process.
25      Q. And so why don't you describe when it is that that's

### Page 38

 1   introduced or implemented? Is it part of a preemployment
 2   offer or is it after a person has accepted an offer of
 3   employment?
 4      A. Normally, it's used on a preoffer as part of our
 5   information that we analyze to determine if we want to hire
 6   somebody, part of the puzzle.
 7      Q. Then you said that once Mr. Vick became employed
 8   with the firm, then maybe a business developed around that
 9   tool; is that right?
10      A. Again, it's -- I wasn't involved much in management
11   back then and I don't recall as an employee whether -- whether
12   we had much of a business there or not. I might have been an
13   early partner even when Mr. Vick was there, but over the
14   years, Mr. Vick grew the practice, yes.
15      Q. All right. To your knowledge and recollection, was
16   he the first to do so?
17      A. Again, I'm uncertain.
18      Q. How long was Mr. Vick employed with the firm?
19      A. Approximately 14 years.
20      Q. In what capacity or capacities?
21      A. Lead person in the -- and in that case it was the PI
22   division because I don't believe we had much of a leadership
23   division or even concept of that until probably the very end
24   of Mr. Vick's tenure.
25      Q. What do you know of how Mr. Vick or others

### Page 39

 1   developed, then, that PI tool as a business device for the
 2   firm?
 3      A. Went out and networked with people, tried to join
 4   groups, give speeches, give people examples of how it worked
 5   and impress them with that and then just tried to close their
 6   deals.
 7      Q. And so there was money to be made if you can sell
 8   this tool to employers; is that kind of the general idea?
 9      A. It's the general idea, yes.
10      Q. Is there some other idea about how you make money
11   from a sale of or promotion of this product?
12      A. I suppose it's possible that the leader or one of
13   the people could develop an additional revenue source if they
14   sold some consulting outside of just the PI. I'm not sure if
15   that happens very often, but it's possible.
16      Q. All right. You don't know whether or not the firm
17   has done that, sell consulting services relating to the --
18      A. Well, the firm has not. It would have been the
19   person in PI that would have sold those services.
20          And maybe one or two occasions somebody else might
21   have sold it too, as I really try to think about it.
22      Q. Now there was a license agreement that the firm had
23   with Praendex?
24      A. Correct.
25      Q. Were there separate agreements that related to the

### Page 40

 1   firm's use of the tool for its own benefit versus going out to
 2   try to sell it to others?
 3      A. Not that I'm aware of.
 4      Q. Did each employee who was working in the leadership
 5   group sign an agreement with Praendex, a license agreement?
 6      A. To the best of my knowledge.
 7      Q. Have you ever signed one?
 8      A. No, I don't work in the PI division.
 9      Q. But in respect to the work that you do in overseeing
10   the employees who work in that group, you yourself don't, to
11   your knowledge?
12      A. No. I give no services in that area at all and that
13   agreement is signed by people who give services to clients.
14      Q. To your knowledge, Mr. Vick would have signed such
15   an agreement?
16      A. To my knowledge, yes.
17      Q. Ms. Darke would have signed such an agreement?
18      A. I believe so.
19      Q. Are you aware, by the way, of any violation of any
20   terms of that agreement signed by Mr. -- that license
21   agreement that she signed with Praendex?
22      A. She being?
23      Q. Ms. Darke.
24      A. Ms. Darke. I'm uncertain of that.
25      Q. Do you have any knowledge or information from any

SHEET 11

**41**

1 source which might cause you to believe that she had violated
2 any term of that agreement?
3    A. The only -- and this is secondhand, the only
4 information that I heard was that she did a consulting job
5 actually at one of our firm's clients the summer she left on
6 her own, billed them on her own.
7       I'm uncertain what she did there, if she used PI or
8 if she just used her knowledge of PI, but it was certainly
9 similar to the type of work she was doing with us, I would
10 assume.
11    Q. Where did you get that information or what is the
12 source of that information?
13    A. I don't even recall. A client might have mentioned
14 it.
15    Q. Who was the client?
16    A. Factory Motor Parts.
17    Q. And you don't know whether or not the consulting
18 that Ms. Darke performed had anything to do with PI?
19    A. I do not. We chose not to pursue it.
20    Q. If it didn't have anything to do with PI, then there
21 would be no violation of any of the terms of the license
22 agreement that you're aware of; is that right?
23    A. As long as there was no other tool like PI used,
24 there would be no violations with her noncompete with PI work.
25    Q. So if it was not related to PI tools or --

**42**

1    A. Similar.
2    Q. -- or similar tools, then that consulting would not
3 have been a violation of any agreement?
4    A. That's correct.
5    Q. Any other information from any source or knowledge
6 of any matters from any source about any possible violation of
7 any agreement that Ms. Darke had with the firm?
8    A. No.
9       MR. GLENNON: Let's go off the record for
10 just a moment.
11       (A discussion was held off the record.)
12 BY MR. GLENNON:
13    Q. Who were the employees in the leadership group as of
14 the time Ms. Darke became an employee of the firm?
15    A. Randy Vick. I don't recall if there was an
16 administrative person, and if there was, what her name was.
17       Jean Laplant, I know may have been there. I don't
18 know if she was there when Patty started, but she certainly
19 was there during Patty's employment.
20    Q. Anybody else?
21    A. Not that I can recall.
22    Q. The name Chad Stelljes has been mentioned. Is that
23 a name that is familiar to you?
24    A. Yes.
25    Q. And who is he?

**43**

1    A. He was the number two person who left I believe
2 before Ms. Darke was hired.
3    Q. What duties or functions did he perform as the
4 number two person?
5    A. Training, trying to generate new sales, trying to
6 service clients.
7    Q. And as the head or the lead person in the
8 department, what did Mr. Vick do?
9    A. The same things.
10    Q. Do you know how long Mr. Stelljes was an employee of
11 the firm?
12    A. Two to four years.
13    Q. Had he worked in that department the entire time?
14    A. Yes.
15    Q. And when I say "department," I mean leadership
16 group.
17    A. I understand.
18    Q. Thank you.
19       How was Mr. Stelljes compensated?
20    A. I honestly don't recall.
21    Q. Do you know whether it was a salary plus bonus and
22 commissions or do you simply not recall?
23    A. No, I don't recall.
24    Q. How was Mr. Vick compensated?
25    A. Commissions.

**44**

1    Q. Entirely commission-based?
2    A. Entirely commission based on his own sales and then
3 I think it may have had a very small override on a second
4 person's sales.
5    Q. Let's take them in turn. You said commission based
6 on his own sales?
7    A. Yes.
8    Q. Are those any sales on the PI tool that he serviced
9 or that he initially himself generated?
10    A. He was there 14 years, so I would imagine he sold
11 them and serviced them.
12    Q. But if, for example, he was not responsible for
13 bringing in a customer for the PI tool, but he provided
14 service to it, was he paid on that?
15    A. 5 percent override.
16    Q. Well, let's talk about -- but nothing other than a
17 5 percent override, is that your testimony, sir?
18    A. While the employee was there, yeah.
19    Q. How about if a partner somehow was able to generate
20 the business which Mr. Vick then serviced, what was he paid on
21 that?
22    A. He was paid a commission on that.
23    Q. Are you sure on that?
24    A. Yes, partners did not receive any compensation for
25 referring business there.

**45**

1  Q. And what was the percentage of the commission which
2  he received for the sales or the services that he performed?
3  A. By percentage do you mean what was his percentage of
4  compensation?
5  Q. Yes.
6  A. I think it was 34 percent.
7      MS. ROBACK: For clarification, are you
8  talking about that partners referred or that he generated
9  himself?
10      MR. GLENNON: Either one. I understand
11  that the number would be the same.
12  A. Right.
13  BY MR. GLENNON:
14  Q. And 34 percent was then applied against or toward
15  what number to determine what he would be paid?
16  A. Collections.
17  Q. If something was sold but not collected, he would
18  not receive payment?
19  A. Correct.
20  Q. Did the 34 percent change at any level?
21  A. I believe he had a graduated scale, so the answer to
22  that is yes.
23  Q. Do you recall what the increments were or the
24  thresholds which affected the percentage increase?
25  A. I don't recall the incremental percentage changes,

**46**

1  but I think it was every $50,000 on that increment, not on the
2  whole sales, just on that -- at that additional 50,000 and
3  there were like two or three levels of that.
4  Q. Mr. Vick left employment with the firm when, sir, do
5  you recall?
6  A. I don't.
7  Q. Do you recall whether it was 2003?
8  A. I do not recall if it was 2003.
9  Q. He left employment during the time that Ms. Darke
10  was employed with the firm, is that right, sir?
11  A. Yes.
12  Q. Why did he leave the firm?
13  A. He was unhappy with his compensation and he and
14  Ms. Darke did not get along very well.
15  Q. Is this based upon your own knowledge, sir,
16  something that he told you?
17  A. Yes.
18  Q. How was he unhappy with his compensation, that he
19  told you?
20  A. From what I recall, rather than trying to sell more,
21  he wanted his compensation to go up by a higher percentage.
22  Q. And what do you mean by that, sir?
23  A. Rather than going out and working harder to earn
24  more, he wanted to have the same revenue dollars and get paid
25  more.

**47**

1  Q. So he wanted to be paid more without increasing his
2  production?
3  A. Umm-hmm. Yes.
4  Q. And did you take exception to that desire on his
5  part that he expressed to you?
6  A. He was denied. He did not ask every month that we
7  had meetings. It was a one- or two-time request.
8  Q. Over what period of time?
9  A. Towards the end of his employment.
10  Q. Were you the person who communicated the denial of
11  his request, to be paid more without increasing his
12  production?
13  A. I believe I would be. I would have been.
14  Q. What did you say to him?
15  A. Told him no.
16  Q. Anything else?
17      MS. ROBACK: I'm sorry. I didn't hear the
18  question.
19  BY MR. GLENNON:
20  Q. Anything else?
21  A. Probably advised him to go out and get more sales.
22  Q. Did Mr. Vick claim that in any way he was not being
23  provided compensation that he was promised in any way?
24  A. No.
25  Q. How do you know that his unhappiness with his

**48**

1  compensation was a factor which led to Mr. Vick leaving the
2  firm?
3  A. I just recall a couple general requests on his part,
4  a couple responses on our part.
5  Q. Is it an assumption that you made that he left
6  because he was unhappy with the firm or did he tell you that?
7  A. I think he told me that.
8  Q. Was he asked to leave the firm?
9  A. No.
10  Q. Was he informed in any way that there was
11  dissatisfaction with his performance preceding his separation
12  from the firm?
13  A. There was constructive advice given to him.
14  Q. What does that mean, sir?
15  A. We might have requested him to learn more to sell
16  more.
17  Q. Maybe it was something that I read into one of your
18  answers or maybe it was an indication of your own thinking.
19  Was there any thought on your part that he wasn't working as
20  hard as he should be?
21  A. Probably.
22  Q. You also indicated that he was not getting along
23  with Ms. Darke. How did you know that?
24  A. They both complained about the other one to me.
25  Q. What did Ms. Darke say about him?

**53**

1  employment with the firm?
2  A. I'm not aware of that.
3  Q. How about any time frame as far as the introduction
4  of these or availability of these variations?
5  A. I think they were introduced kind of as he out --
6  was going out the door, so by that I mean maybe in the last
7  six months of employment. Again, I'm really guessing on the
8  number of months.
9  Q. You had mentioned that Mr. Vick's customers were
10  transferred to Ms. Darke to then provide service when he left?
11  A. I believe they were, yes.
12  Q. So she was servicing, performing work for her own
13  customers plus then those that were transferred to her that he
14  had formerly serviced; is that right?
15  A. That's correct. She did not have many of her own
16  clients at the time.
17  Q. I'm sorry, what?
18  A. She did not have very many clients at the time.
19  Q. Was she also responsible for any other duties that
20  he had performed or functions that he had done?
21  A. He didn't really have any other duties.
22  Q. Was Ms. Darke performing any other duties or
23  functions outside of the general sales and service functions
24  for the PI tool, either within the firm or for partners of the
25  firm?

**54**

1  A. There was one speaking type of engagement that one
2  of the partners developed as an opportunity to sell more, and
3  again, they were supposed to be out speaking and finding
4  opportunities like that on their own, but this was kind of a
5  special one. So Ms. Darke did coordinate that along with that
6  partner.
7  Q. You mentioned that after Ms. Darke assumed
8  Mr. Vick's work that there was then going to be an effort to
9  try to find someone to hire within the group to either assist
10  her or assist the group; is that right?
11  A. We were looking for a number two person, yes.
12  Q. Was such a person hired?
13  A. I think we hired perhaps -- I don't know. We hired
14  two people during her tenure, I believe.
15  Q. Who were they?
16  A. One was Rachel Peters and I believe the other one
17  was Lynn Mallory. That's what I can recall.
18  Q. What did Rachel Peters do?
19  A. Basically the same things at a lower level than
20  Ms. Darke, probably with a little more emphasis towards
21  training and a little less emphasis towards going out and
22  selling at the beginning.
23  Q. And by training you mean training customers of the
24  firm who purchased the tool?
25  A. Customers of that division, yes.

**55**

1  Q. Is Ms. Peters still an employee of the firm?
2  A. No, she's not.
3  Q. When did she leave?
4  A. She was not with us very long. I don't recall when
5  she started or when she left.
6  Q. And you don't remember the period of time that she
7  worked with the firm? Just not very long, you said?
8  A. Right.
9  Q. You don't know how that translates to months or
10  years?
11  A. Months.
12  Q. Why did she leave; do you know?
13  A. She got another job with City Business, I believe,
14  she thought was a better opportunity.
15  Q. You also mentioned Lynn Mallory. Did she replace
16  Ms. Peters in that job?
17  A. I'm not sure which one came first, off the top of my
18  head, but she either replaced Rachel or Rachel replaced her.
19  I think Lynn came second.
20  Q. Did she perform the functions that you described
21  Rachel Peters as performing?
22  A. Again, she was not with us very long, but her job
23  duties were of a similar nature.
24  Q. Do you know why she left?
25  A. Yes. She decided she didn't want to work, as I

**56**

1  understand.
2  Q. So for some period of time, I gather, then, there
3  was no number two person in the department?
4  A. Correct.
5  Q. Who performed the functions that Ms. Peters and
6  Ms. Mallory had performed after they had left?
7  A. Ms. Darke. I'm sure Jean Laplant, the
8  administrative assistant, started to step up and help a little
9  bit more too.
10  Q. After Mr. Vick left and during the times that
11  Ms. Peters and Ms. Mallory were not employed, it was then just
12  Ms. Darke and Ms. Laplant in the department?
13  A. Umm-hmm, yes.
14          MS. ROBACK: Do you want to take a
15  five-minute break?
16          MR. GLENNON: Sure, fine.
17          (A break was taken from 10:27 until 10:37.)
18  BY MR. GLENNON:
19  Q. Mr. Kaufmann, we've taken a short break.
20      As a result of any time of reflection that you've
21  had or whatever during the break, is there any of your prior
22  testimony which you need to change?
23  A. No, but I did think of one other -- one additional
24  fact, and that is when you speak of Randy Vick's percentages
25  and the increments, he paid his own retirement plan and his

**57**

1 own CPE and his own traveling. I think with the exception of
2 one trip annually to the annual meeting for PI, everything
3 else came out of that percentage, which that percentage we
4 called it "entitlement" in his calculation. So his gross pay
5 was less those percentages by those items. I don't know if
6 you can understand that.
7  Q. Let's break those down.
8     You said he paid his own retirement plan. What do
9 you mean by that?
10  A. The firm makes a profit-sharing contribution and in
11 Mr. Vick's case, it was reduced out of his percentage --
12 percentage balance available. So he paid it himself. He
13 repaid us by reducing his comp.
14  Q. Why was that arrangement set up with respect to his
15 retirement plan?
16  A. That was the arrangement that was set up with him
17 when he came to work with us.
18  Q. Was that at his request?
19  A. It was negotiated when the percentages were decided,
20 so I don't know.
21  Q. Did it allow him to have any control on the amounts
22 that would be contributed to his plan, to his retirement plan?
23  A. Not to the profit-sharing plan, but he had the
24 401(k) that he could alter, which always comes out of your
25 gross pay. So if he wanted less, he could have done less

**58**

1 401(k).
2  Q. Now, I thought you had referred to this as a
3 retirement plan as opposed to a profit-sharing plan?
4  A. The retirement plan is an overall word for all
5 different types of retirement plans. There's a profit-sharing
6 plan, there's a 401(k) provision within that profit-sharing
7 plan, and there may have been -- again, I don't know if
8 Mr. Vick was here when we implemented the pension plan, but we
9 did have a pension plan at the end also. And I'm not sure if
10 he was gone or there when that occurred.
11  Q. And then you said CPE expenses?
12  A. Yes.
13  Q. What are those, sir?
14  A. He would take some other courses, seminars, and some
15 were in town and some were definitely where he traveled.
16  Q. And you said that he paid for those, or with the
17 exception of one annual trip, he paid for some of the others?
18  A. Correct.
19  Q. Was there a limit on how many out-of-town seminars
20 or courses could be taken by the directors?
21  A. Not that I'm aware of, no.
22     MS. ROBACK: Excuse me, did you say
23 directors?
24     MR. GLENNON: Yes, I did.
25  A. There's no formal limitation.

**59**

1 BY MR. GLENNON:
2  Q. So they're approved on a case-by-case basis?
3  A. Yes.
4  Q. Based upon the relationship to the work that the
5 person is doing?
6  A. Yes.
7  Q. And the perceived value of the course to the work
8 that the person is doing?
9  A. Yes, and if it was available in town or if they had
10 to travel to go to it.
11  Q. All right. Anything else that you recall as a
12 result of either reflection or otherwise during the break --
13  A. No.
14  Q. -- concerning your prior testimony?
15  A. No.
16  Q. We were talking about the duties which Ms. Darke
17 assumed following Mr. Vick's departure.
18     And do you recall, sir, that Mr. Vick left
19 employment on approximately four hours' notice?
20  A. No, I don't recall that.
21  Q. Did Mr. Vick, while he was employed, head any or was
22 he responsible for heading any department meetings of the
23 leadership group?
24  A. Their own meetings without me?
25  Q. With or without you.

**60**

1  A. I don't think that he was in charge of any, no, not
2 that I'm aware of anyways.
3  Q. Were there any meetings of the group on any periodic
4 basis?
5  A. Randy and I met.
6  Q. How about of the department?
7  A. I'm not aware.
8  Q. And when you and he met, was that on a regular basis
9 or intermittent?
10  A. We tried to make it on a regular basis but with our
11 schedules, it became a little more intermittent.
12  Q. What was discussed during those meetings?
13  A. Mostly strategic planning on how to grow Predictive
14 Index, and I tried to get information about leads so that I
15 could pass that on to the firm to see if anybody knew somebody
16 to get involved and help close the deal for him.
17  Q. And after he left, did you have those meetings with
18 anybody else in the department?
19  A. I believe Patty and I had similar meetings.
20  Q. So she was responsible then, I gather, for
21 discussing strategic planning with you and providing you with
22 status of updates concerning the sales --
23  A. Yes.
24  Q. -- PI sales?
25  A. Yes.

## 77

1  package which Mr. Vick had with the firm in the interview?
2  A. No.
3  Q. Did you ever indicate, in words or substance, that
4  Ms. Darke would be promoted to Mr. Vick's position upon his
5  separation from the firm if she remained an employee in good
6  standing with the firm?
7  A. I don't recall when, but at some point we talked
8  about Ms. Darke -- Ms. Darke and I talked about the
9  possibility that she would assume the number one role if
10 Mr. Vick left, possibly.
11 Q. You have no idea when that occurred?
12 A. No, I don't.
13 Q. If we came to understand that Mr. Vick left in 2003,
14 mid-2003, would that help you at all with respect to when you
15 might have had that conversation with Ms. Darke?
16 A. No.
17 Q. And do you deny that you in the interview process
18 told Ms. Darke that she would be promoted to Mr. Vick's
19 position upon his leaving the firm?
20 A. I don't recall.
21 Q. Do you deny that in the interview process you
22 informed Ms. Darke that she would receive Mr. Vick's
23 compensation plan or package?
24 A. I deny that, yes.
25 Q. Excuse me?

## 78

1  A. Yes, I deny that.
2  Q. And why are you able to recall that but not the
3  other references about Mr. Vick?
4  A. There would be no reason for me to discuss
5  Mr. Vick's compensation with somebody interviewing for another
6  position.
7  Q. Did you indicate what, if any, succession plan the
8  firm may be considering should Mr. Vick leave the firm?
9  A. I said I don't recall when we talked about the
10 position, but I never promised anybody any compensation
11 package or income level.
12 Q. How did you go about deciding the compensation plan
13 that would be offered to Ms. Darke if she accepted this offer
14 of employment?
15 A. I don't recall the process, but it was trying to
16 determine how much of a base and how much of a percentage she
17 would start with, and going forward, it could change.
18 Q. Do you know whether the offer of employment that she
19 received was higher or lower than the compensation package
20 which Mr. Stelljes had received?
21 A. Pretty certain that their compensation levels were
22 very similar.
23 Q. And what is it that causes you to conclude that,
24 given the fact that you don't recall how Mr. Stelljes was
25 compensated?

## 79

1  A. I just recall part of the process is that we were
2  looking at what Mr. Stelljes had as comp and used that as a
3  comparison, along with Ms. Darke's request, and came up with
4  what we thought was fair.
5  Q. Did you tell her that she was being paid what or
6  comparable to how he was being paid?
7  A. I don't recall.
8  Q. Is there anything else that you can recall of the
9  interview meeting that you had with Ms. Darke preceding the
10 offer of employment to her?
11 A. No.
12     (The court reporter marked for identification
13     Defendant's Exhibit 1.)
14 BY MR. GLENNON:
15 Q. Exhibit 1 is before you now, sir.
16     MR. GLENNON: And, Ms. Roback, is it okay
17 for the next couple of days if we just have defendant's
18 sequential number that we can rather than have --
19     MS. ROBACK: Was this an exhibit
20 yesterday?
21     MR. GLENNON: It was, but it didn't copy
22 very well when it was used yesterday. Let's just call this
23 Defendant's Exhibit 1 for now.
24     MS. ROBACK: Okay.
25

## 80

1  BY MR. GLENNON:
2  Q. Defendant's Exhibit 1 is before --
3     MS. ROBACK: Wait one second. I just
4  don't want it to get confused because we Bates numbered ours
5  different. It's 1 -- DEF 1. Do you want --
6     MR. GLENNON: Defendant's Deposition
7  Exhibit?
8     MS. ROBACK: Why don't we say, yes,
9  Defendant's Deposition Exhibit if you want, or LBLCO. However
10 you want. I just don't want to confuse it with our Bates
11 numbers, so . . .
12 BY MR. GLENNON:
13 Q. How about your Deposition Exhibit No. 1, sir --
14     MS. ROBACK: Kaufmann deposition?
15     MR. GLENNON: If that's the way you want
16 to do it. Because I think -- let's go off the record for a
17 moment.
18     (A discussion was held off the record.)
19 BY MR. GLENNON:
20 Q. Defendant's Deposition Exhibit 1 is before you now,
21 sir. Would you look at this document and then when you have
22 completed your review of it, please identify this for the
23 record.
24 A. It's some notes in my handwriting.
25 Q. When did you create this document, sir?

81

1  A. Based on what's on this form, it looks like I
2  created this document sometime during the hiring process of
3  Ms. Darke.
4  Q. Do you know whether or not this was a document that
5  you actually gave to Ms. Darke in the interview -- in her
6  interview process?
7  A. I don't recall if I did or not.
8  Q. What do these numbers refer to, sir?
9  A. It looks to me like there's a discussion of a base
10 salary, commission rate on PI sales, a commission rate on
11 other business sales cross selling, and then a total that says
12 "under the above assumptions, Ms. Darke would earn $81,000."
13     So I was trying to illustrate -- if I showed it to
14 her, I was trying to illustrate how the percentages worked. I
15 don't recall if it was just my notes trying to come up with
16 the right percentages or if it was actually shown to
17 Ms. Darke.
18 Q. Did Ms. Darke tell you that she was looking for
19 total compensation in her first year of $90,000?
20 A. I don't recall the number.
21     I recall Ms. Darke being unhappy with her
22 compensation almost right away.
23 Q. Do you understand the question that I asked you,
24 though, sir?
25 A. Yeah, I said I don't recall the number.

82

1  Q. She did indicate to you, though, that in the
2  interview process that she was looking for a certain number;
3  isn't that right?
4  A. Yeah, I think she did.
5  Q. And you were trying to show her that there were ways
6  that she could expect to reach that compensation figure, isn't
7  that right, sir?
8  A. I don't think so, no.
9  Q. Well, you've got in the right-hand column -- that
10 says "expected compensation," does it not, sir, "expected
11 compensation"?
12 A. Yes, it does.
13 Q. That's your handwriting?
14 A. I think so.
15 Q. And toward the top center of the page, it says,
16 "override 7.5 percent on sales." Is that your writing, sir?
17 A. I don't believe so.
18 Q. Do you know to what that refers?
19 A. I do not.
20 Q. And over to the left of that, there is "50,000
21 base." Do you see that, sir?
22 A. Yes.
23 Q. To what does that refer?
24 A. I do not know.
25 Q. Is that your writing?

83

1  A. No, it is not.
2  Q. Do you know whether the offer which Ms. Darke
3  received had a $50,000 base salary component to it?
4  A. I believe it did.
5  Q. Do you know how the number got from 45,000 in your
6  handwriting, in Exhibit 1, to 50,000 in the offer that was
7  extended to her?
8  A. No, I don't. That's why I'm saying this could have
9  just been notes that I was taking. I honestly don't know. To
10 try and come up with the formula.
11 Q. Do you deny giving a copy of this document to
12 Ms. Darke in the interview process?
13 A. I don't recall, so I will not deny it.
14 Q. Below the base salary number, sir, is "80,000
15 PI-20 percent comm rate." Did I read that correctly, sir?
16 A. Yes, you did.
17 Q. And then there is a "$16,000" in the column which
18 you entitled "Expected Compensation." Do you see that, sir?
19 A. Yes, I do.
20 Q. What does this mean?
21 A. 20 percent of an assumption of $80,000 of PI sales.
22 Q. So this assumes her selling $80,000 of new PI
23 product in the first year in order to receive the $16,000
24 expected compensation piece, is that right, sir?
25 A. It's meant to show her how the formulas would work.

84

1  I never predicted what sales level she would get to, nor did I
2  ever tell her what compensation she would earn, because it's
3  in the future. I couldn't -- I couldn't come up with a
4  number.
5  Q. But the $80,000 PI, this assumed that she would sell
6  $80,000 of new PI product in her first year, is that right,
7  sir?
8  A. As an example under these assumptions, yes.
9  Q. And then below that is "$80,000 of" -- what does
10 that then, read after that, sir?
11 A. "Accounting, tax and consulting."
12 Q. And to what does that relate, sir, or what does that
13 relate to?
14 A. I imagine that would be new business originated by
15 Ms. Darke that was not PI-related would be accounting, tax or
16 other consulting.
17 Q. That she developed for the firm in her first year?
18 A. Yes.
19 Q. And if she did that, she would receive 25 percent of
20 that; is that right?
21 A. Yes.
22 Q. And hence the $20,000 figure in the expected
23 compensation column, is that right, sir?
24 A. Correct.
25 Q. Do you know how much accounting, tax or consulting

### 101

1   A. Based upon my perceptions right now?
2   Q. Perceptions and observations in the year 2000?
3   A. I don't have any specific recollections of her
4   performance. I would assume it was okay.
5   Q. Because she continued as an employee or something
6   else?
7   A. Yeah.
8   Q. Anything else?
9   A. The only other thing, I'm not sure if it started
10  already then or not, but there was a pretty steady flow of or
11  complaints about her compensation.
12  Q. If we can, let's talk about, and I will promise you
13  we'll come back and talk about that, but I just want to talk
14  now about your impressions and observations concerning her
15  performance of her duties and her jobs.
16      How about the year 2001, your perceptions and
17  impressions and observations of her performance in 2001?
18  A. I don't have -- I don't have any recollections of
19  poor performance until after she left and we started hearing
20  from some of the clients. That might help you in your line of
21  questioning, save some time.
22  Q. During the time that she was there, though, it's
23  fair to say, whether we took year by year or just take the
24  entire period of time, your impressions and observations,
25  perceptions concerning her employment was that she was doing a

### 102

1   good job?
2   A. Yes.
3   Q. Did you in words or other means indicate to her that
4   she was doing a good job?
5   A. I don't recollect specific discussions, but I may
6   have.
7   Q. Did you ever tell her that she was a good employee
8   and she was working hard and performing well?
9   A. I don't recollect those exact words.
10  Q. Those impressions, did you indicate to her in any
11  way that you believed that she was a good employee and she was
12  working hard, doing well?
13  A. I don't remember if I said that or not, but my
14  impressions of her were that she was a good employee.
15  Q. Is there a reason why you would not have so
16  indicated to her?
17  A. There's no reason I wouldn't have. I just don't
18  recall doing it.
19  Q. Now, you also indicated that at some time some
20  complaints were made by her about compensation-related
21  matters?
22  A. Yes.
23  Q. Why don't you tell me what you can recall about that
24  from the first time that you had such a report or complaint?
25  A. Almost from day one, she was using her last job or

### 103

1   the number she wanted to make. Later it turned into
2   Randy Vick's deal, quote, but she complained monthly about --
3   actually I shouldn't say monthly, frequently about her
4   compensation.
5       Even in our departmental meetings that we have for
6   strategic planning, compensation would be brought up by her
7   sometimes.
8   Q. What did she indicate?
9   A. She wanted more money.
10  Q. Did she indicate to you that she was not earning the
11  compensation that you had indicated to her at any previous
12  time she would make?
13  A. No.
14  Q. On any occasion, did Ms. Darke say in words or
15  substance that she was not being paid what she was told or
16  promised she would be paid by the firm?
17  A. The last, I don't know, year, maybe longer, she
18  started telling me she wasn't being paid -- she wanted --
19  maybe to quote her, almost quote is that she said, "I was
20  promised Randy Vick's deal and I want it."
21      And every time she said that I said, "You were not
22  promised Randy Vick's deal and it's not available."
23  Q. When is the first time you can recall her telling
24  you that, that she wanted Randy Vick's deal -- that she was
25  promised Randy Vick's deal and she wanted it?

### 104

1   A. I don't really recall. I'm not sure if it was
2   before he left or after he left.
3   Q. And this was in department meetings as well, wasn't
4   it, that she --
5   A. They were private meetings between Patty and myself,
6   not with other members of the department.
7   Q. So all of the occasions that you can recall her
8   communicating to you that she was promised Randy Vick's deal
9   and wanted it were in private sessions, one-on-one sessions
10  with you and her?
11  A. Yes.
12  Q. And no one else was ever present?
13  A. I got to be careful again. I can't say for sure
14  nobody was ever present, so I'll just have to say I can't
15  recall, to be safe.
16  Q. Did you ever talk to anybody else at the firm other
17  than Ms. Darke about her stating that she was promised Randy
18  Vick's deal and wanted to receive that deal?
19  A. Those specific words may have been -- probably were
20  brought to the executive committee.
21  Q. By whom?
22  A. By me.
23  Q. And what did you tell the executive committee?
24  A. Exactly what she said.
25  Q. And what did they say to you?