**105**

1    A. They asked me if I did tell her. I said,
2  "Absolutely, I did not promise her anything of the sort." And
3  continued to try to work it out.
4       When Randy left, Randy and Patty were so adverse to
5  each other that I recommended to the executive committee that
6  we change to a departmental incentive rather than individual
7  incentive and then maybe everybody would be working towards
8  the same goals.
9       And eventually, I don't know exactly when, but I
10 came up with a formula that rewarded everybody on the entire
11 sales of the department, the entire collection of the
12 department rather than their own efforts in the hope that they
13 would form a team and actually work together.
14    Q. So you were the person who changed the compensation
15 method that you wanted persons in the department to go to?
16    A. I'm the one who made the recommendation. I report
17 to the executive committee, but I made the recommendation to
18 the executive committee.
19    Q. Was that recommendation ever adopted by the
20 executive committee?
21    A. I'm sure it was.
22    Q. Why do you say that?
23    A. We implemented it.
24    Q. With respect to Ms. Darke?
25    A. Yes.

**106**

1    Q. Did you request that she agree to that change or did
2  you tell her that there was going to be that change based upon
3  the executive committee's decision?
4    A. I don't recall how I expressed it.
5    Q. Well, did you tell her before the executive
6  committee made the decision to change the compensation basis
7  that it was going to be changed or that there was discussion
8  about it changing?
9    A. I don't recall when I told her.
10   Q. When you told her, though, you told her that the
11 executive committee had made the decision to change the
12 compensation basis; isn't that correct?
13   A. I don't recall the exact words. I told her. I
14 don't know how I told her.
15   Q. The decision had been made by the executive
16 committee, correct?
17   A. Yes.
18   Q. You were not looking for her to agree to that, you
19 were there to tell her that; isn't that right?
20   A. Yeah, our firm really doesn't pay our people what
21 they say they want to be paid. We set the compensation for
22 all of our employees.
23   Q. When this change was implemented with respect to
24 Ms. Darke, you told her that the executive committee had made
25 the change and this was going to be the way -- this was going

**107**

1  to be the compensation basis going forward; isn't that
2  correct?
3    A. In some manner or words, yes.
4    Q. In other words, for her to take it or leave it;
5  isn't that right?
6    A. No.
7    Q. What do you mean "no"?
8    A. I never said take it or leave it.
9    Q. Well, did you indicate to her that it was free for
10 her to accept or reject and if she wanted to be paid some
11 different way, she could?
12   A. She was free to accept or reject and leave whenever
13 she wanted to. She was an employee at will from day one.
14   Q. That's my point. If she didn't accept this new
15 compensation basis, her choice would be to leave the firm?
16   A. I guess I really don't know what options she would
17 have had. It would be the same as every other time she
18 complained. We would have talked about it.
19      I think at the very end I said I would go back to
20 the executive committee and present something for her that
21 would be a little different than what she was getting, but I
22 don't recall that I ever got her suggestion on that.
23   Q. The decision that she was being asked to make was
24 either accept this new compensation basis that the executive
25 committee had determined and decided on, and either accept

**108**

1  that or to leave the firm, isn't that quite simple?
2    A. It was never --
3        MS. ROBACK: I just want to object as
4  speculative if you're asking him what she understood it to be.
5        MR. GLENNON: And thank you, I do
6  appreciate that.
7  BY MR. GLENNON:
8    Q. I'm not trying to overcomplicate this.
9        But what did you understand her choices were once
10 the executive committee made the decision with respect to this
11 new compensation plan?
12   A. The same as her decisions were all the time, to stay
13 and complain, to leave if she wanted to, those were always
14 options for her.
15   Q. So to accept it or to leave?
16   A. Like any other time and every other time, yes.
17   Q. Do you recall when this new compensation basis was
18 put in place?
19   A. Around Randy's departure is the best I could say. I
20 don't remember when that was.
21   Q. And does it help you establish a context of the time
22 when you told Ms. Darke that Mr. Vick's compensation package
23 or plan was not available to her or was no longer available to
24 her?
25   A. Excuse me, I'm sorry, I missed the first part.

EXHIBIT 26

**109**

1   Q. Did you ever tell Ms. Darke that the compensation
2   plan or program which Mr. Vick had received was no longer
3   available to her?
4   A. Every time she asked for it, I told her "it wasn't
5   available." I never said "no longer available." I said "it
6   was not available," and I told her I did not promise it to
7   her."
8   Q. So you never told her, you deny ever telling her
9   that Mr. Vick's compensation plan or package was no longer
10  available to her?
11  A. Correct.
12  Q. Did you tell her around the time that this new
13  compensation plan was adopted by the executive committee that
14  Mr. Vick's pay plan or program was not available to her?
15  A. Did I tell the executive committee that?
16  Q. No, I'm sorry.
17      Around the time that the executive committee made
18  the decision for this new compensation basis, around that time
19  did you tell her that Mr. Vick's pay program or pay plan was
20  not available to her?
21  A. Every time she mentioned it, I told her that.
22  Q. Right. And that's what I'm asking you, was one of
23  the times that she mentioned it and that you mentioned it, was
24  that around the time of the new plan being --
25  A. First of all, I never brought that up.

**110**

1   Q. I'm not asking whether you did or she did.
2   A. You said "if I brought it up or her," so I'm making
3   it clear, I did not.
4       And I don't recall when she started on that. It
5   wasn't at the beginning of her work with us. She just then
6   was underpaid, and then later, she started saying that she was
7   promised that. And I said, "You were never promised that.
8   "It's not -- I mean it's not available."
9   Q. When do you think the first time was that you can
10  recall her indicating to you that she was promised Mr. Vick's
11  pay basis or plan and that she wanted it?
12  A. I don't really recall.
13  Q. Did you say that first after she started, the first
14  indications from her about compensation problems or complaints
15  related to her not making as much money as she wanted to make?
16  A. Yes.
17  Q. For how long did those complaints get reported to
18  you?
19  A. Forever.
20  Q. Did she put it in context of I was not -- that she
21  did not receive the amount of compensation that she expected
22  to receive?
23  A. Never.
24  Q. Did she ever tell you that the amount of
25  compensation that she was receiving was not as much as she was

**111**

1   told by you she could reasonably expect to receive?
2   A. Not that I recall.
3   Q. So at what point then -- and you don't recall -- the
4   first time was where there was reference to Randy Vick's deal
5   that she wanted, and do you recall the last time that she
6   indicated that she had been promised Randy Vick's deal and
7   that she wanted it?
8   A. I don't remember the last time I heard those words,
9   and I don't remember the first time I heard those words.
10  Q. Was it in 2005; do you recall?
11      MS. ROBACK: I'm going to object. It's
12  asked and answered many times. He does not recall.
13      MR. GLENNON: Well, we're just trying to
14  help him at all.
15  BY MR. GLENNON:
16  Q. In the last -- she left at the end of May of 2005.
17  Do you recall that?
18  A. Yes.
19  Q. Do you recall in any of the discussions in 2005
20  which preceded her separation that she made reference to being
21  promised Randy Vick's deal and wanting it?
22  A. The last thing I remember is that within a day or
23  two or three when she left and she and I were talking, she
24  said one of the things we could do was compensate her for lost
25  pay, something along those lines.

**112**

1   Q. Ms. Darke said that or someone on her behalf?
2   A. I think it was Ms. Darke.
3   Q. What do you recall of that communication?
4   A. It was probably my last attempt to reconcile with
5   her. I had reached impasse with her. I don't remember
6   exactly when, but at some point in time, I had reached
7   impasse, and I then decided she could work through HR, like
8   all of our employees do on their compensation matters, because
9   I wasn't getting anywhere.
10      And she then accused our HR manager of making
11  certain comments that I heard about. I'm not even sure where
12  I heard that from. Maybe from Patty. I then went and
13  followed up and investigated and our HR manager said he did
14  not make those comments.
15      So then I went back to Patty and I told her that,
16  you know, if he did make those comments, they weren't on
17  behalf of the firm. I did not direct him to make those
18  comments and that is not the firm's position.
19      And I still tried to say, "What can we do to make it
20  better and to relieve your stress or your unhappiness?"
21      And that's when she said, "Pay me my backpay."
22      And that was pretty much the end of it.
23  Q. What did you understand her to be saying about
24  backpay?
25  A. I assume, again, that she's on the same track that

**113**

1 she's always been on and she felt she was underpaid or she
2 needed more and that we should correct the situation.
3    Q. Was backpay some reference to the Randy Vick deal
4 that she said that she was promised?
5    A. I don't honestly know. I don't think that was
6 specifically brought up.
7    Q. And then you said that there was some discussion
8 that she had had with the HR manager. Who was that?
9    A. Greg Cornman.
10    Q. And what did she say he had said that you referenced
11 in your prior testimony?
12    A. Oh, boy. What was it? Something about a demotion.
13 Boy, I don't remember the specifics. There were three or four
14 things that he said that -- or that she -- that he allegedly
15 said, I'm sorry, that were just not true, and so I went and
16 made sure that it was known that that was not from the firm
17 and that Greg was denying it, but it certainly wasn't the
18 firm's intention for it to be communicated. So I just cleared
19 the air with her on that.
20    Q. You mentioned demotion. Did you understand from
21 your discussion with Mr. Cornman that she said that he had
22 indicated to her that she would be demoted in any way?
23    A. That's what I had heard from Patty, and that's when
24 I went back to Greg to find out if he said it because there
25 were no intentions to demote Ms. Darke ever.

**114**

1    Q. And so he denied it, Mr. Cornman denied saying that
2 to Ms. Darke?
3    A. Yes.
4    Q. What else did she say to you that you then went and
5 checked with him?
6    A. That's where I don't remember what it was, but I
7 remembered three or four things.
8    Q. Was stripping her of her management duties another
9 one?
10    A. I don't recollect. She really didn't have a lot of
11 management duties per se. I mean she was in charge of sales.
12 That was her area and she was still in charge of sales after
13 that, so there was no changes in her job description.
14    Q. I'm asking you what it was that Mr. Cornman --
15    A. I don't recall if that was --
16    Q. -- had allegedly said to her.
17        MS. ROBACK: For the record, that she
18 alleged he said?
19        MR. GLENNON: Yes.
20 BY MR. GLENNON:
21    Q. Did you discuss with Mr. Cornman whether or not he
22 had said that she may be stripped of her management duties?
23    A. It sounds familiar, so that might have been one of
24 the other things he said that I went and said was not coming
25 from the firm.

**115**

1    Q. Did he -- Mr. Cornman --
2        MS. ROBACK: Said, allegedly said.
3    A. Allegedly said, I'm sorry.
4 BY MR. GLENNON:
5    Q. Did Mr. Cornman deny making such a statement --
6    A. Absolutely.
7    Q. -- or so indicating to Ms. Darke?
8    A. Absolutely.
9    Q. How about termination, did Ms. Darke indicate to you
10 that he had talked about termination in her meeting with him?
11    A. That might have been the third one, but I'm not
12 absolutely certain.
13    Q. Did you ask him whether he had made any reference to
14 termination in his discussion with her?
15    A. Whatever the third item was, if it was a termination
16 and he allegedly said something to the effect that she would
17 be terminated, I certainly did have discussions with him about
18 that.
19    Q. Did he deny?
20    A. Absolutely.
21    Q. So he denied making any reference to termination in
22 his discussion with Ms. Darke?
23    A. Yeah.
24        MS. ROBACK: "Yes"?
25    A. Yes. I'm sorry. I'm tired of this.

**116**

1        MS. ROBACK: Are we going to take a break
2 sometime?
3        MR. GLENNON: What would you like to do?
4 We can go off the record for a moment.
5        (A discussion was held off the record.)
6        (A break was taken from 12:04 until 1:00.)
7 BY MR. GLENNON:
8    Q. We've had a lunch break, Mr. Kaufmann, and we've
9 returned from that. You understand, of course, that you
10 remain under oath with respect to our conversation today?
11    A. Yes.
12    Q. We were talking at some length in this morning's
13 session, sir, about the complaints or reports of complaints to
14 you by Ms. Darke concerning compensation-related matters
15 during her employment with the firm, and you had said --
16 generally, I'm just trying to get back into the area of our
17 discussion.
18       You had said that initially the conversations or the
19 reports of the complaints were of a nature of she wasn't
20 making enough money. Do you recall that, sir?
21    A. She wasn't making enough money, yeah, I definitely
22 recall that.
23    Q. And then you said at some later time, the complaints
24 were of the nature of she had been promised Randy Vick's pay
25 and she wanted it. Do you recall that, sir?

**125**

1 firm's overhead, really, so we probably included her with all
2 the administrative people in the office.
3     Q. Are you aware of any other employee in the
4 leadership group who received the same compensation terms as
5 Ms. Darke?
6     A. No. We changed the culture. There were business
7 reasons why and we decided to change the culture when Mr. Vick
8 left.
9     Q. So your answer is no, you're not aware of any other
10 employee?
11    A. I said "no" first.
12    Q. Are you aware of any employee in the leadership
13 group who received the same compensation terms as Mr. Vick?
14    A. No, I'm not.
15    Q. Are you aware of any employee in the leadership
16 group who received the same compensation terms as
17 Mr. Stelljes?
18    A. I don't recall his terms.
19    Q. So as you sit here, you're not able to identify --
20    A. I'm not able to answer that, I'm sorry.
21    Q. Are you aware of any conversations that Mr. Lapidus
22 had with Ms. Darke concerning any aspect of Ms. Darke's
23 employment?
24    A. No, I'm not.
25    Q. Are you aware of any occasion in which he either

**126**

1 berated or belittled her concerning her work production?
2     A. I don't have any specific knowledge, firsthand
3 knowledge, but Mr. Lapidus has a different management style
4 and he likes to be very aggressive with all of our employees.
5     Q. Well, what do you mean by that?
6     A. He's real tough on our employees. Great producer
7 revenue-wise and tough on all of our employees, tough on his
8 partners too.
9     Q. Why don't you describe what you mean by "tough on
10 employees"?
11    A. He can get angry at them. He can say things that
12 are not totally acceptable within our culture that we're
13 trying to create within our firm. I guess that kind of sums
14 it up. I mean, but he's an equal -- equal opportunity
15 offender.
16    Q. Does that make any of this right or better, sir?
17        MS. ROBACK: Object as to form of the
18 question, right or better than what?
19 BY MR. GLENNON:
20    Q. Does that somehow make it okay or is it not okay?
21 I'm just trying to understand, when you referenced the
22 culture, things that are or are not acceptable, what you meant
23 by that.
24    A. That portion of his performance is not necessarily
25 okay but difficult to change.

**127**

1     Q. What efforts have been made to try to change it?
2     A. He's been counseled by myself, by the executive
3 committee, and I'm not sure of the time frame, but at one
4 point in time he went for anger management because we set that
5 as a requirement for him.
6     Q. Since being counseled by you and the executive
7 committee and attending that anger management that you
8 described, has he had any continuing problems in the workplace
9 with respect to his treatment of employees?
10    A. He's not totally healed. He's better, but under
11 pressure sometimes things still come out.
12    Q. What kinds of things come out?
13    A. Again, just anger.
14    Q. Yells at people?
15    A. Yells at people, says a derogatory word or two.
16    Q. When you say "derogatory word," what do you mean, a
17 belittling comment?
18    A. Yeah.
19    Q. Does he swear at people?
20    A. He swore at me, so yes.
21    Q. Has he ever used any inappropriate reference to a
22 woman, any slang?
23    A. I've never heard him do that, no.
24    Q. No derogatory term in reference to a gender-related
25 matter that you've ever heard come out of his mouth?

**128**

1     A. No. I -- honestly, he is an equal opportunity jerk
2 at times and he gives it to everybody. I think he may be
3 nicer to women.
4     Q. What's your reason for saying that?
5     A. Just might be a hair softer.
6     Q. Has any woman reported any complaints or concerns
7 about any language ever directed toward them by Mr. Lapidus?
8     A. Any women?
9     Q. Any woman.
10    A. Probably yes. Men also.
11    Q. I'm asking about women right now. Thank you.
12    A. Umm-hmm.
13    Q. What women have complained or reported problems with
14 Mr. Lapidus's language directed toward them?
15    A. What time frame are you referring to now?
16    Q. As far back as you can remember until as recently as
17 you can remember.
18    A. That's a long time.
19    Q. Well, it sounds like it's been a problem for a long
20 time, so I would appreciate your --
21        MS. ROBACK: Is that a question?
22        MR. GLENNON: It is.
23 BY MR. GLENNON:
24    Q. It sounds like it's been a long time, so please
25 recall from the earliest time till most recent time.

**Page 129**

1  A. Again, I don't necessarily keep a listing or a
2  record in my memory of who, so. I know that Mary Franklin and
3  Jackie Hasser -- I think her name was when she worked with
4  us -- were demeaned by Mr. Lapidus and did discuss with me his
5  behavior, but not as a gender matter, as a respectful matter
6  or a lack of respect. I've never had a gender complaint about
7  Mr. Lapidus.
8  Q. What other women have complained about or reported
9  inappropriate behavior on the part of Mr. Lapidus?
10  A. You know, I know there are other men and other
11  women, but I don't recall their names, and I don't remember if
12  they complained or if I just, you know, heard about it.
13  Q. Well, from any source of information, are you aware
14  of any instance of inappropriate language or behavior directed
15  by Mr. Lapidus towards Tiffany Walz?
16  A. Tiffany Walz was a very strong woman. I don't
17  remember her filing a complaint. She had problems with
18  Mr. Polinchek, another one of our partners, and I'm sure at
19  some point in time Neil might have said something to her too.
20  I don't remember, but it's possible.
21      MS. ROBACK: Only testify to what you
22  know.
23  BY MR. GLENNON:
24  Q. I'm not talking about filing a complaint.
25      What do you mean by "filing a complaint" when you

**Page 130**

1  make that reference?
2  A. Coming and formally complaining.
3  Q. What is "formally complaining"?
4  A. Telling me what happened and asking me to
5  investigate it.
6  Q. A person has to make a request that something be
7  investigated before you treat it as a formal complaint?
8  A. Not necessarily, but that --
9  Q. That's one way?
10  A. (Moves head up and down.)
11  Q. Do you require somebody to take some affirmative
12  step before you investigate a possible instance of gender
13  discrimination or other employment discrimination?
14      MS. ROBACK: I'm going to object to this
15  that you're implying that what he said was gender
16  discrimination or -- I forgot the second one you said.
17  A. I said there was never a gender complaint about
18  Mr. Lapidus.
19  BY MR. GLENNON:
20  Q. Your testimony is what it is and so forth, and I
21  appreciate the correction, but I'm asking you as far as the
22  company has an antidiscrimination policy of some kind, I'm
23  assuming, is that right, sir?
24  A. Yes.
25  Q. And I ask because of your role as managing partner,

**Page 131**

1  I'm assuming that you're familiar with that policy; is that
2  correct?
3  A. More or less, yes.
4  Q. More or less?
5  A. Well, I don't know every word in it, but I
6  understand the meanings behind it.
7  Q. And also you for some period of your tenure as
8  managing partner oversaw the human resources area, is that
9  right, sir?
10  A. Correct.
11  Q. Is it human resources that is responsible for the
12  monitoring of the policies including nondiscrimination in the
13  firm's workplace?
14  A. Yes.
15  Q. And what do you understand the firm's policy is with
16  respect to discrimination, employment discrimination?
17  A. We don't allow it.
18  Q. How about with respect to reprisal or retaliation
19  discrimination concerning anybody who has provided information
20  concerning a possible violation of the nondiscrimination
21  policy?
22  A. That's not allowed, either.
23  Q. You agree with me, sir, that it would be a violation
24  of the firm policy for the firm or any partner of the firm to
25  engage in any reprisal or retaliation against any employee of

**Page 132**

1  the firm who had complained about an act or statement which
2  the person construed to be gender discrimination?
3  A. If I was informed of a gender discrimination or fact
4  or comment that somebody felt was inappropriate because of
5  gender, yes.
6  Q. And you would agree, sir, that there can be many
7  forms of retaliation or reprisal discrimination in the
8  workplace, can't there?
9      MS. ROBACK: I object to the extent it
10  calls for a legal conclusion.
11  BY MR. GLENNON:
12  Q. Well, does the policy define what retaliation or
13  reprisal discrimination consists of, sir?
14  A. No, I don't believe it does.
15  Q. Do you have an understanding based upon your role as
16  managing partner and your supervision of the human resource
17  area during some tenure of your service as managing partner as
18  to whether or not shaming or ridiculing somebody in the
19  workplace would be a prohibited form of retaliation or
20  reprisal discrimination?
21  A. Yes.
22  Q. How about threats of demotion or reduction in
23  duties?
24  A. If they were made in connection with a complaint
25  like that, yes.

**133**

1  Q. Sir, does the firm have any policies with respect to
2  either equal pay or fair pay to employees of the firm based
3  upon gender?
4  A. Yes.
5  Q. And what policy or policies are those?
6  A. Again, they're in our personnel manual. I don't
7  know exactly what they say.
8  Q. Do you know if under the policies it would be a
9  violation of the firm's policies to pay a woman less than a
10 man for the same work?
11      MS. ROBACK: I'm going to object to the
12 form of the question, and object on the basis of vague when
13 you say "same work."
14 A. It depends on their background, their experience,
15 not their gender. But there are people with more experience
16 in our firm doing the same or similar work that others are
17 doing and you might call it the same and their compensation is
18 not the same, but it's never related to gender.
19 BY MR. GLENNON:
20 Q. Well, and what I'm asking you is simpler than
21 perhaps I made it appear. And I'm talking about not similar
22 work, I'm talking about the same work.
23 A. Same answer.
24 Q. So it may not be a violation of the firm's policy
25 for a man and a woman both doing the same work, for the woman

**134**

1  to be paid less than a man?
2  A. I don't think they're gender matters.
3  Q. What about if the difference was gender and only
4  gender, firm policy --
5  A. Not even considered.
6  Q. But if it was, would the firm's policy prohibit
7  that?
8  A. Not if it were because of gender it would not, no.
9  Q. You had talked about a little bit earlier, sir, at
10 some point in time you stopped talking to Ms. Darke about
11 compensation matters which she was complaining about, is that
12 right, sir?
13 A. Yes.
14 Q. When did that occur?
15 A. Within the last month of her employment, I think.
16 Q. And what did you say to her to let her know that you
17 were done talking to her about it?
18 A. I told her that we were at an impasse and that --
19 again, I'm not sure of the exact words, but I was managing
20 partner and I had a lot of things to take care of in the firm
21 and I wanted her to talk to Greg Cornman, our HR person, like
22 the rest of the employees.
23 Q. So did you tell her that she could no longer talk to
24 you about those compensation matters?
25 A. I encouraged her to talk to Greg. I don't know if I

**135**

1  used the exact words, "you cannot talk to me," but I said, "Go
2  through HR."
3  Q. So is it your testimony that you never informed
4  Ms. Darke that she could no longer talk to you about
5  compensation-related matters?
6  A. No. I'm just saying I encouraged her to go to HR.
7  I'm not sure if I told her don't talk to me ever again. I
8  just at that place in time was as frustrated as she was and we
9  weren't getting anywhere, and I decided that maybe she should
10 talk to another person.
11 Q. What were the -- at that point, sir, what were the
12 sources of frustration concerning the compensation?
13 A. On my part?
14 Q. Yes.
15 A. The continual harassment by her demanding things
16 that were never promised to her.
17 Q. What did she say?
18 A. She wants Randy Vick's compensation, or program.
19 I'm not even sure which it was, and "it was promised to me"
20 and I told her it was not promised to her.
21 Q. But that's what she was continuing to demand that
22 led to your frustration?
23 A. After a while, yes.
24 Q. And I just wanted to get an understanding as to
25 whether or not there was something else that was a part of the

**136**

1  complaints, the compensation-related complaints, but it sounds
2  like it really was over the Randy Vick pay program that she
3  was continuing to request?
4  A. Well, at some point in time in the process, she also
5  complained that there were other consultants across the
6  country that were being compensated in a different manner than
7  she was and she felt like she should be compensated like them
8  also, and that wasn't our business model. There were a number
9  of differences and it was irrelevant.
10 Q. And why was it irrelevant?
11 A. Because we owned the license, number one, and most
12 of those cases the consultants were the owners of the license;
13 and number two, most of them worked out of their homes, had
14 very little overhead; and number three, we don't set our
15 compensation based on what other people are doing across the
16 country.
17 Q. At some point did Ms. Darke become a commission
18 salesperson?
19 A. I don't believe her title ever changed regarding
20 that.
21 Q. Did you ever refer to Ms. Darke as a commission
22 salesperson?
23 A. I referred to her both as a consultant and a
24 commissioned salesperson at different times, probably
25 throughout her entire tenure with us.

**137**

1  Q. In what times or in what circumstances?
2  A. Always. Her job included both.
3  Q. Was there any distinction under the -- any of the
4  director's agreements presented to Ms. Darke concerning any
5  entitlements that she may receive as a commissioned
6  salesperson as separate and distinct from an employee?
7  A. The director's agreements are all exactly the same
8  with the exception of -- really, it would have been two people
9  that didn't fit the model that that director's agreement was
10 set up for. The model was basically set up for people with
11 chargeable time and going out and billing clients.
12     It wasn't set up for people who were out selling and
13 didn't have a charge hour requirement, or administrative
14 person. I think the head of our admin that became a director
15 and didn't charge hours, she just did her job. So those two
16 were altered.
17 Q. What do you mean "altered"?
18 A. Put different definitions in of their services.
19 Q. So the director's agreement presented to Ms. Darke
20 was different from the director's agreement signed by other
21 directors?
22 A. I believe the first one didn't have some of those
23 comments in there. They were changed on her telling me that
24 "This isn't really geared for me."
25     And I looked at it and said, "You're right, we need

**138**

1  to get one that's more tailored for a person like you." And
2  specifically, since Ms. Darke's compensation was very much
3  commission-based and our employees are not as commission-based
4  in our employee deferred -- the other employees for
5  compensation arrangements, they do not get deferred
6  compensation on their commissions.
7     In Ms. Darke's case, she would have gotten deferred
8  comp on her commissions because that is what she was earning.
9  Q. Let's talk about you mentioned at least -- you've
10 mentioned more than one director's agreements presented to
11 her.
12     When do you recall the first director's agreement
13 being presented to her?
14 A. Well, after a partner retreat -- now, what year is
15 it? So it would have been in the July or August time frame.
16 I think 2004, but I'm not certain of the date exactly. Maybe
17 it was 2005, actually.
18 Q. She left at the end of May 2005.
19 A. So it would have been '03 or '04. You can see the
20 dates, I'm having troubles with them, I'm sorry.
21 Q. And so you're talking about a partner's meeting?
22 A. Promotions of our employees are decided at a firm
23 retreat.
24 Q. And so what -- how does that lead to a director's
25 agreement being presented to her?

**139**

1  A. Decisions are made at our July retreat about people
2  getting promoted to manager, promoted to director, and then
3  they are notified after the retreat that they've been
4  distinguished and honored with the promotion of director.
5  Q. And so how does that tie, then, to a director's
6  agreement presented to Ms. Darke?
7  A. Well, they're presented a director's agreement to
8  sign, and they're normally our highest paid employees anyway
9  so there isn't necessarily an increase in compensation, but
10 they're held out inside our firm as being stronger than our
11 managers, more important than our managers.
12 Q. Based -- I'm sorry.
13 A. I'm sorry.
14     And there may be some public notice to that too,
15 although I don't know if the public really understands the
16 difference between a partner or director or manager.
17 Q. But at least internally within the firm, in the
18 decision, the way it was made at the partners retreat to make
19 Ms. Darke a director, that was based upon recognition that she
20 had earned in her performance and her production?
21 A. Absolutely.
22 Q. And so that partners meeting was in July?
23 A. Yes. If you know the year, tell me, because I'm not
24 positive I remember which year it is.
25 Q. I'm assuming it to be 2004, but again, what I

**140**

1  remember and what I know is not important here.
2  A. Yeah, that could be. I just don't want to go on the
3  record and be misleading anybody.
4  Q. Did she receive a promotion of any kind at that
5  time?
6  A. Well, the director's position is a promotion. She
7  was also given the title of president for the outside world.
8  Q. What does that mean?
9  A. Virtually nothing, other than it helped her in the
10 way she could present herself to CEOs and COOs and people that
11 she was trying to sell Predictive Index to, so it was to
12 accommodate her.
13 Q. And I assume in some ways it accommodated the firm
14 as well in that it would give her a heightened status with the
15 outside world?
16 A. Well, through whatever benefits we get from owning
17 the license, yes.
18 Q. But the president of leadership group, that's the
19 new title that was also given to her at the time that she
20 became a director?
21 A. Yes.
22 Q. Other than the director's agreement, is there any
23 other document that is signed between the firm and the new
24 director signifying or reflecting that occurrence?
25 A. No.

**145**

1    A.  We've never told anybody that.
2    Q.  I'm asking you about Mr. Hugunin.
3    A.  No.
4    Q.  Was Mr. Hugunin ever told that if he did not sign
5  the director's agreement that he would be demoted?
6    A.  No.
7    Q.  Was Mr. Hugunin ever told that if he did not sign
8  the director's agreement that he would have any duties or
9  responsibilities taken away from him?
10   A.  No.
11   Q.  Let's get back to the first director's agreement
12 presented to Ms. Darke. At some time you gave her a
13 director's agreement or caused one to be delivered to her?
14   A.  Yes.
15   Q.  What happened after that concerning the agreement
16 being signed or not signed?
17   A.  As I recall, Ms. Darke pointed out to us that some
18 of the items didn't really relate to her because she was in a
19 different area of the firm, and she wanted us to take a look
20 at it, and I said we would.
21       And again, we might not have done that in a timely
22 manner because we're all busy serving clients in addition to
23 the things we're doing running a firm, but it was reviewed and
24 changed.
25   Q.  By whom?

**146**

1    A.  Either Greg Cornman or myself. I'm not sure which
2  one of us or if it was a joint effort.
3    Q.  This agreement would have contained a noncompete
4  provision, is that right, sir?
5    A.  Yes.
6    Q.  And to your knowledge, was the first noncompete
7  provision in any agreement that was presented to Ms. Darke
8  other than the Praendex exhibit that we referred to earlier as
9  Exhibit 3, but was this the first agreement between the firm
10 and Ms. Darke that contained a noncompete?
11   A.  No. There were two areas that Ms. Darke wanted us
12 to take a look at. One of them was the noncompete language
13 and in the definition of what she could not do, and the second
14 was to look at the compensation -- deferred compensation
15 calculation and make it more accountable for her role in our
16 firm.
17   Q.  My question, though, was, to your knowledge, was
18 this the first agreement -- was this director's agreement the
19 first agreement between Ms. Darke and the firm which contained
20 a noncompete agreement?
21       MS. ROBACK: Other than the Praendex?
22       MR. GLENNON: Well, that actually was an
23 agreement among three parties.
24 BY MR. GLENNON:
25   Q.  I'm talking about a two-party agreement between the

**147**

1  firm and Ms. Darke. Was this the first document that
2  contained a noncompete agreement or provision?
3    A.  We do not get noncompetes from any of our employees
4  until they become directors.
5    Q.  So my question is yes?
6    A.  That would be the first one.
7    Q.  All right. Did she talk to you about concerns that
8  she had regarding the noncompete provision?
9    A.  Yes.
10   Q.  What did she say to you?
11   A.  She thought the noncompete provisions were unfair
12 and she wanted, like always, more compensation.
13   Q.  What compensation did she say she wanted associated
14 with the noncompete?
15   A.  She wanted more compensation to make it worth
16 signing, and I believe she was referring to the deferred
17 compensation in the contract.
18   Q.  Well, she was also talking to you about this time
19 about getting Mr. Vick's package, wasn't she?
20   A.  She was doing that all along.
21   Q.  So that's a yes?
22   A.  Not in the same context of the director agreement,
23 no.
24   Q.  Are you saying that at the time she was discussing
25 the concerns that she had about the director's agreement, she

**148**

1  was not talking to you about still requesting Mr. Vick's pay
2  package?
3    A.  I don't believe they happened at the same time or in
4  context with each other.
5    Q.  What was the period of time over which the
6  director's agreement presented to her was discussed with her?
7    A.  I don't know. We probably had a couple discussions.
8  If you say she got it in November and we took it back, I
9  imagine it took us a few months to get it corrected and bring
10 it back to her.
11   Q.  Well, there were discussions about the second form
12 of director's agreement in April of -- April and May of '05,
13 were there not?
14   A.  Umm-hmm, yes.
15   Q.  Okay. So you're not testifying that between
16 November of 2004 and April or May of 2005, Ms. Darke wasn't
17 requesting that she receive Mr. Vick's pay program, are you,
18 sir?
19   A.  I'm not suggesting that. She was not discussing
20 that with me in context to the deferred -- or to the
21 director's agreement.
22   Q.  How did she indicate that she was talking about them
23 in two different contexts?
24   A.  Compensation is compensation. The director's
25 agreement really was noncompete and deferred comp. I never

**149**

1 tied the two together.
2 Q. Let's talk about at some point the firm got back to
3 her with a new form of agreement?
4 A. Yes.
5 Q. And what were the differences from the prior form of
6 agreement that you can recall?
7 A. I recall that there was a change to the compensation
8 that was used to compute deferred comp for Ms. Darke and it
9 was improved to her benefit, which it should have been to
10 start with, but it included commissions as part of her
11 compensation. The first change.
12     And the second change is we tried to tailor the
13 wording around the activities that she could not do in order
14 to not break that noncompete with us more towards her position
15 rather than an accounting position or a tax accountant's
16 position.
17 Q. Now, at this time, April, May of 2005, was Ms. Darke
18 a commissioned salesperson?
19 A. Ms. Darke's always been a consultant and a
20 commissioned salesperson, so I assume she was at that time,
21 yes.
22 Q. Did the second form of director's agreement contain
23 any minimum number of hours that she was expected to work?
24 A. I don't recall.
25 Q. Other than as you described, are you able to recall

**150**

1 any of the terms of the second director's agreement presented
2 to her?
3 A. Not specifically to hers, no. Most of the
4 director's agreement have had some language like that. I
5 don't know if it was pulled or if it was left in this one.
6 Q. Did that apply, did those hours, minimum hours
7 provision apply to Ms. Darke and the work that she did?
8 A. As far as the director's agreement goes?
9 Q. Yes.
10 A. Every director kind of asked about that, and it was
11 really just a measure that everybody was working full time in
12 order to -- in order to earn your vesting, so that would have
13 been my answer. If it were there and if I were questioned,
14 that's always been my answer.
15 Q. I'm talking now specifically about Ms. Darke.
16 A. She's the same.
17 Q. Did you have discussions with Ms. Darke about the
18 second form of the agreement presented to her?
19 A. I'm sure sometime in the process we did, yes.
20 Q. Do you recall when and what was said?
21 A. She said she was going to take it to her attorney
22 and her attorney was out of town. I think I remember her
23 telling me that once. Then she told me her attorney advised
24 her not to sign it.
25 Q. You don't have a problem, by the way, with an

**151**

1 employee having a lawyer look at a legal document presented to
2 them by the firm, do you?
3 A. No, I would recommend it.
4 Q. And you understand, then, that after the lawyer did
5 so, she came back to you and said there are certain problems
6 with it. Did she identify what those problems were?
7 A. The compensation wasn't large enough, i.e. the
8 deferred compensation in relationship to the noncompete
9 provisions.
10 Q. Are you aware of any personnel, including partners
11 of the firm, commenting to Ms. Darke as to whether or not the
12 perceived value of the benefit she would receive in deferred
13 compensation under the director's agreement would equal the
14 value of her signing a noncompete?
15 A. Am I aware of anybody in the firm? I'm not aware of
16 it, although I believe I saw some alleged comment in one of
17 the papers I reviewed in preparation for this, so -- I told
18 you I scanned through a number of papers. I'm not aware of
19 it, no.
20 Q. So you don't know whether or not, for example, Beth
21 Leonard informed her that, in Ms. Leonard's estimation, the
22 value to Ms. Darke of deferred compensation did not equal the
23 value of what she would be giving up in terms of having to
24 sign a noncompete?
25 A. I have no knowledge of that.

**152**

1 Q. What then happened next after Ms. Darke had conveyed
2 her concerns and/or her lawyer's concerns to you?
3 A. I think we withdrew the director's agreement so that
4 it wasn't an outstanding issue, and I don't know of anything
5 else that happened.
6 Q. Who communicated to Ms. Darke concerning the need to
7 sign or consequences for not signing the director's agreement?
8 A. I don't know what consequences there would be other
9 than not getting deferred compensation, so I don't think
10 anybody did.
11 Q. So your testimony is that Ms. Darke's refusal to
12 sign the director's agreement only resulted in her not
13 receiving the deferred compensation?
14 A. She didn't get the director's agreement title also.
15 Q. When had she started performing the duties of a
16 director?
17 A. There's no formal delineation of when you do and
18 when you don't.
19 Q. So your testimony is, sir, that until Ms. Darke
20 signed the director's agreement, she was not performing any
21 duties of a director?
22 A. Yeah, there's nothing specific. I would say that
23 there is a continuum of performance and Ms. Darke never signed
24 the director's agreement so she was never officially promoted
25 to the director, which was mostly internal anyways, and she

**153**

1 was left with the president title so she could go out and
2 sell.
3    Q. And her duties in no way changed as a result of her
4 failure to sign the director's agreement, is that your
5 testimony, sir?
6    A. Her day-to-day duties did not change. She was still
7 responsible for selling. If we were making some decisions
8 about hiring, there would have been more people involved
9 probably.
10   Q. Different people? In other words, she would not
11 then be involved in that decision, is that --
12   A. Oh, no, she might have been involved also. As a
13 conversation or debate between Ms. Darke and myself that had
14 been going on for -- and again, I don't know exactly how long
15 as to whether we should hire a trainer or hire a person that's
16 kind of like Ms. Darke, they could do everything, and
17 Ms. Darke wanted a trainer, if I recall it correctly.
18     I think my executive committee wasn't exactly on
19 board with that. So we went back and forth on it. I tried to
20 advocate for Ms. Darke.
21   Q. And what was the outcome of that?
22   A. Well, as we became more concerned that Ms. Darke
23 wasn't going to stay with our firm, we decided that we should,
24 like we do in every area of our business, institutionalize the
25 program, so we made a decision to hire a lower level person

**154**

1 that could do both.
2   Q. What reason did you have for concern that Ms. Darke
3 might leave the firm?
4   A. Her continued complaining.
5   Q. About compensation?
6   A. Yes.
7   Q. I'm sorry?
8   A. Yes.
9   Q. And about the package that she said she'd been
10 promised and wanted to be paid that Mr. Vick had received?
11   A. You know, I don't know if that specifically came out
12 at that point in time, but safe to assume.
13     MS. ROBACK: Don't assume.
14     THE WITNESS: Okay. Sorry.
15 BY MR. GLENNON:
16   Q. At what point did that then lead to the so-called
17 institutionalization that you described?
18   A. I don't know the exact date, but at some point in
19 time we decided that we should have two people that are
20 capable of selling, training and educating and building
21 relationships with the clients rather than one. It was better
22 for the firm.
23   Q. And that decision was made while Ms. Darke was at
24 the firm, correct?
25   A. Yes, I believe it was.

**155**

1   Q. And what actions were taken to bring about that
2 institutionalization while Ms. Darke was at the firm?
3   A. Well, the only thing probably that happened was I
4 informed Ms. Darke that we had decided to go that direction
5 instead of the other.
6   Q. Did you tell her that such a person was going to be
7 hired?
8   A. We were going to try to hire a person like that.
9   Q. Did you tell her that a person was going to be hired
10 in case she left the firm?
11   A. I don't recall saying those words.
12   Q. Did you ever talk to her about any concern or
13 perception on the firm's part that she might leave the firm?
14   A. Not that I recall.
15   Q. Did you ever talk to Mr. Cornman about that?
16   A. Not that I recall.
17   Q. Do you know whether Mr. Cornman talked to Ms. Darke
18 about that?
19   A. Not that I'm aware of.
20   Q. Did you provide Mr. Cornman direction with respect
21 to any communications he had with Ms. Darke in the last couple
22 of months of her employment?
23     MS. ROBACK: I object as vague.
24   A. I was going to say, nothing specific.
25

**156**

1 BY MR. GLENNON:
2   Q. Well, do you recall in any way telling him to either
3 talk to Ms. Darke about certain things or to carry out any
4 actions with respect to Ms. Darke?
5   A. Absolutely not.
6   Q. You know, we were talking before about persons who
7 Mr. Lapidus may have spoken inappropriately to, and I wanted
8 to make sure that we got the entire list of women that you can
9 recall may have been subjected to inappropriate language or
10 conduct on his behalf.
11     You had mentioned Miss Franklin and Jackie -- I
12 think her maiden name was other than Kepner.
13   A. Excuse me?
14   Q. Jackie, the person you identified before, do you
15 know if her married name is Kepner?
16   A. I'm not sure. I know she's married.
17   Q. Same person that you described? You identified a
18 Jackie earlier. Who is that Jackie?
19   A. Jackie Hasser was our backup receptionist.
20   Q. And you had described what -- that she may have been
21 demeaned by Mr. Lapidus or he said something that was
22 disrespectful of her?
23   A. Yes.
24   Q. What did he say or what did he do?
25   A. Again, I can't say exactly, but he was very angry.

### 161

1 and he wasn't satisfied, and I believe, per Andrea, he showed
2 his anger.
3   Q. How did he show his anger?
4   A. I don't know the answer to that from Mr. Lapidus or
5 from Andrea Woods. I don't -- I have heard hearsay.
6   Q. As a managing partner, what information made its way
7 to you concerning how he displayed his anger?
8   A. That he was mean, disrespectful, yelled. That might
9 have been the one where he threw a file. I'm not certain, but
10 he threw a file at me when I started at the firm. He was the
11 manager and I was entry level, and he threw a file at me back
12 in 1977. So he allegedly had done that in this case, I
13 believe.
14   Q. Did you ever check with her or anyone else to see
15 whether or not he had in fact thrown a file at her, as he had
16 at you many years earlier?
17   A. Andrea, from what I again recall -- this goes back
18 probably three years maybe, or longer -- did talk to me about
19 it more as her mentor and as the person that she worked for
20 most of the time, and I have a very different management style
21 than Mr. Lapidus also, and so I think she talked to me about
22 it, and I counseled her on it and let her know it wasn't
23 personal.
24       And I probably went back to Neil and said, "Don't do
25 that anymore. This is a problem."

### 162

1   Q. Anything else?
2   A. Not that I recall.
3   Q. Was there any other consequence to Mr. Lapidus other
4 than you counseling him and telling him not to do it anymore
5 for him having thrown a file at an employee?
6   A. Not that I'm aware of.
7   Q. Any other employees whom you are aware of who have
8 been the subject of inappropriate conduct or statements by
9 Mr. Lapidus?
10   A. I have no specific knowledge.
11   Q. How about general knowledge, as the managing partner
12 of a firm?
13   A. Again, I don't have any general knowledge either,
14 but I'm not going to sit here and say he didn't do that to
15 anybody.
16   Q. Did you ever tell Ms. Darke that she was greedy?
17   A. Perhaps.
18   Q. When did you do so?
19   A. In one of our many discussions about compensation.
20   Q. Did you tell her that the executive committee saw
21 her as greedy?
22   A. I don't think I used those words, but I may have
23 said something similar.
24   Q. Did you tell Ms. Darke that she was not a team
25 player?

### 163

1   A. Probably early on when she was with us and her and
2 Randy weren't getting along, I might have told them both that,
3 trying to counsel them. I'm not sure if I recall any other
4 time telling her that.
5   Q. So after Mr. Vick had left, you don't recall ever
6 indicating to her or telling her that she was not a team
7 player?
8   A. Not specifically.
9   Q. Do you ever recall telling her that the executive
10 committee saw her as not a team player?
11   A. I don't think so.
12   Q. Did you ever try to distance yourself from
13 Ms. Darke?
14   A. When I asked her to start working through
15 Mr. Cornman, I distanced myself from Ms. Darke as far as
16 compensation issues go and the director's agreement, yes.
17   Q. Otherwise did you have regular interaction with her?
18   A. Yes.
19   Q. Other than compensation issues, in no way did your
20 contact with her or exposure to her change, is that your
21 testimony, sir?
22   A. I'm sorry, I don't understand the question.
23   Q. You had indicated to her that you and she -- that
24 you would no longer talk compensation issues with her; is that
25 right?

### 164

1   A. Umm-hmm, yes.
2   Q. Did you in any other way distance yourself from her
3 or limit your access to her?
4   A. No.
5   Q. Did Ms. Darke's physical workspace change at all at
6 any time?
7   A. Our building has been under construction for about
8 five years, so we have had people shuffling around, a lot of
9 people, and she may have very well been one of them because I
10 think I remember her sitting in the new space in the biggest
11 office that we had over there. So she wasn't there when she
12 came to us because we didn't have that space. I'm trying to
13 think where she sat before that. Well, the answer is yes.
14   Q. And you have no recollection of when it was that she
15 was moved from one space to another space?
16   A. It would have been in her latter half of her
17 employment because that's probably when we did the
18 construction, but I'm not really involved in the construction
19 at all.
20       But I do recall discussing seating as we moved two
21 departments back into this brand-new space, investment
22 banking, litigation support -- no, just the litigation
23 support, I'm sorry, not the investment banking -- litigation
24 support and the PI group and I remember making sure Patty got
25 the larger of the offices in there.

**169**

1  BY MR. GLENNON:
2  Q. As you sit here today, you don't know of anyone
3  other than Ms. Darke being a salesperson in the group at that
4  time?
5  A. I do not know the employment dates for the two
6  people I mentioned, so I can't answer your question
7  accurately.
8  Q. Did you discuss this, Exhibit 4, with Ms. Darke?
9  A. There are no notes here that I did, but it looks
10 like the beginning, anyways, of some thought on how to change
11 the culture into more of a teamwork, so I may have.
12 Q. Did you talk about the subjects in Exhibit 4 as
13 reflected in the document with Ms. Darke?
14 A. Yes.
15 Q. On the left side, you see there is a line
16 approximately down the center of the page, sir?
17 A. Yes.
18 Q. And it says, "Currently, P Darke."
19    Do you see that there?
20 A. Yes.
21 Q. And then below it is "$58,000 base, commission
22 20 percent on her own origination."
23    Do you see that?
24 A. Yes.
25 Q. What was that meant to signify?

**170**

1  A. That at the time I wrote this note, we were still
2  under the old competitive compensation model where Patty Darke
3  was being paid on her own sales, and I think at that time she
4  had a $58,000 base, I would imagine, since I wrote that there,
5  and her commission rate was probably 20 percent, but only on
6  her own business.
7  Q. What are the other numbers there, sir, then down
8  below that showing the earnings for '03 and '02?
9  A. I'm not sure. The 4/30/03 earnings show a base and
10 some commission, but I'm not sure where they came from or what
11 they represent. They don't tie to the numbers up above.
12 Q. Then do you see on the left-hand side, the bottom
13 half of the contents there, do you see reference to "Randy
14 Vick"?
15 A. Yes.
16 Q. And then for fiscal year 4/30/03?
17 A. Yes.
18 Q. Base of zero and then some figures with respect to
19 commission, do you see that, sir?
20 A. Yes.
21 Q. Does that reflect Randy Vick's compensation package
22 as of 4/30/03?
23 A. On his own originations, yes.
24 Q. And he received 34 percent of the first $350,000?
25 A. Of his collections, not of the department's

**171**

1  collections. Very key word there.
2  Q. Is that what his package was, sir?
3  A. Yes. Well, that was his entitlement.
4  Q. Is that what he was paid on, sir?
5  A. No, because there were deductions from that.
6  Q. He was also paid on sales generated by other
7  persons, isn't that right, sir?
8  A. There was 5 percent override, so if another person
9  had a sale, he did get 5 percent, yes.
10 Q. Is it your testimony, sir, that other than the
11 5 percent override, he did not receive commissions on any
12 other department sales other than those that he himself
13 originated?
14 A. Yes, it is.
15 Q. When Mr. Stelljes left, where did that business go?
16 Who serviced it after that?
17 A. The next hire, Randy.
18 Q. And then Mr. Vick then serviced that work that he
19 did not originate, is that right, sir?
20 A. He serviced it, yes.
21 Q. He was paid on the sales related to the service that
22 he did on those customers, didn't he?
23 A. If there were still collections coming in, yes.
24 Q. And there were still collections coming in, weren't
25 there, sir?

**172**

1  A. That, I don't know for a fact. I've been told not
2  to assume anything, so . . .
3  Q. Well, do you think that all that business went away,
4  did not renew?
5  A. I don't know.
6  Q. As you sit here today, you're not aware of any facts
7  that would support a contention that all of that business went
8  away, are you, sir?
9  A. I'm sorry. Can you repeat that?
10 Q. Yes. You're not able to support an allegation that
11 none of that business continued or renewed, are you, sir?
12 A. No, I don't know that, either.
13 Q. And so this document, Exhibit 4, does reflect the
14 percentages for the commissions received by Mr. Vick at the
15 various levels, is that right, sir, 34 percent of the first
16 350,000, 37 percent of the next 50,000, 40 percent of the next
17 50,000, and 43 percent above 450,000, is that right, sir?
18 A. As I testified before, there were deductions against
19 that calculation which included his profit-sharing
20 contribution that the firm made, which includes CPE,
21 continuing education, and which included his travel and which
22 included networking groups that he joined in order to generate
23 more sales.
24    There might be more, but there were a number of
25 things that were subtracted from this number before Randy Vick

**193**

1  marked Exhibit 10, sir, Defendant's Exhibit 10 and ask you if
2  you've seen that document before.
3      A. (Reviews exhibit.)
4          MS. ROBACK: Just for the record, this is
5  the same as your Bates number 458? I just want to make sure
6  because it doesn't have a Bates number.
7          MR. GLENNON: The fact that it doesn't
8  have a Bates number doesn't mean that it wasn't produced, I
9  guess you're now indicating.
10         MS. ROBACK: Okay. I'm just looking at
11 the one I have exactly like that with a Bates number.
12     A. I've never seen this before, no.
13 BY MR. GLENNON:
14     Q. How about with respect to the formatting of this
15 document, is that familiar to you, sir, as far as how the
16 company -- what the company e-mails look like when they're
17 printed?
18     A. A lot of company -- companies have format like this.
19 This could be ours.
20     Q. How about with respect to the middle entry, the
21 "Greg Cornman 4/28/05 08:57 AM," does that look to you to
22 be -- is that familiar to you as being what the firm's system
23 looks like?
24     A. Yes, could be.
25     Q. Did you talk to Mr. Cornman about the subjects --

**194**

1  any of the subjects of Exhibit 10?
2      A. I might have spoken to him about the director
3  agreement being withdrawn. Like I said, I don't recall if
4  I -- I think I told Patty, but maybe I told Greg too.
5      Q. Do you recall talking to Mr. Cornman about it?
6      A. What's that?
7      Q. Do you recall talking to Mr. Cornman about the
8  withdrawal of the director's agreement?
9      A. Not specifically I don't recall that, no, but I'm
10 not saying I did not.
11     Q. Did you talk to Ms. Darke about that subject?
12     A. I believe so.
13     Q. When did you do so?
14     A. I don't recollect the timing on that.
15     Q. Is it your testimony, sir, that with the -- did you
16 direct Mr. Cornman to inform Ms. Darke that the director's
17 agreement was being withdrawn?
18     A. I'm just not certain at this time.
19     Q. Do you think that Mr. Cornman was doing that on his
20 own without your direction?
21     A. Well, evidently he said a lot of things on his own
22 if what Ms. Darke is alleging is true. This one I don't --
23 this one isn't out of -- this one is not inappropriate for him
24 to have made, so I don't -- I don't know the answer to that.
25     Q. You don't know whether you gave direction to him to

**195**

1  withdraw the director's agreement?
2      A. No, because I might have done it before and he might
3  have been reiterating it. I'm not really certain.
4      Q. How about, sir, is it your testimony that based upon
5  Ms. Darke's unwillingness to sign the director's agreement
6  because of the concerns that she had expressed to you, that
7  the only consequence to her with respect to her continuing
8  employment with or responsibilities for the firm would be that
9  she would not receive the benefits reflected in the director's
10 agreement?
11     A. That's correct.
12     Q. There would be no adverse consequence to her other
13 than her not receiving the benefits in the director's
14 agreement, is that correct, sir?
15     A. I don't recall any adverse reactions or results that
16 would occur, no.
17     Q. And with respect to the director's agreement, the
18 benefit of that agreement would have been potentially her
19 receipt of deferred compensation as reflected therein; is that
20 right?
21     A. Correct.
22     Q. Exhibit 11 is before you now, sir, Defendant's
23 Exhibit 11.
24     A. (Reviews exhibit.)
25     Q. Is this a document that you've seen before, sir?

**196**

1      A. No, I have not seen this before.
2      Q. Are you familiar with Ms. Darke's request to
3  Mr. Cornman for notes of the conversation that took place
4  between yourself and Ms. Darke in 2004?
5      A. I'm not aware of them.
6      Q. Did you ever discuss this subject with Ms. Darke?
7      A. Not that I recall.
8      Q. Were you aware that Ms. Darke had made a request for
9  a copy of her personnel file, her employee file with the firm?
10     A. Sometime at the end of her employment or afterwards,
11 I was made aware of that.
12     Q. Did you have any reaction to that or response to
13 that?
14     A. No.
15     Q. Exhibit 12 is before you now, sir.
16     A. (Reviews exhibit.)
17     Q. It's Ms. Darke's letter to you dated May 16, 2005,
18 sir?
19     A. Correct.
20     Q. Did you receive that document on or about that date?
21     A. Yes.
22     Q. What did you do in response to it?
23     A. Discussed the situation with our executive
24 committee, and if I recall correctly, there was a decision to
25 try to convince Patty to stay. We didn't want her to leave.

SHEET 53

**209**

BY MR. GLENNON:
1. Q. You never told that to Ms. Darke?
2. A. My son hasn't seen a prostitute, so I did not tell Ms. Darke that.
3. Q. Did Ms. Darke tell you that she was disgusted by any discussion about purchasing a prostitute for your son?
4. A. I never discussed a prostitute with Ms. Darke, no.
5. Q. So she never told you that she was disgusted by that?
6. A. No.

MR. GLENNON: I believe that's all I have, Mr. Kaufmann. Thank you for your time today.

MS. ROBACK: I just have a few questions.

EXAMINATION
BY MS. ROBACK:
Q. At the time you interviewed Patricia Darke, did she lead you to believe that she could sell and cross sell?
A. Definitely, yes.
Q. And what was your impression of how she conveyed her ability to sell and cross sell with the position she was applying for?
A. There was so much enthusiasm and discussion about the network she was going to go after and people she knew that I was very optimistic that she would do very well.

**210**

Q. When discussing Randy Vick's compensation package, did Randy Vick receive draws at any time in his compensation package?
A. He received monthly checks, yes.
Q. If there was a shortfall at the end of the year, did Randy Vick have to reimburse the firm?
A. Yes, Randy Vick did not have a guaranteed compensation level at all. It was strictly the percentages so if he didn't sell, he didn't get paid.
Q. When you talked about moving space, were males moved in the space when you talk about the remodeling, along with female employees?
A. Absolutely. As a matter of fact, the males got the smaller offices.
Q. You've testified that on several occasions Ms. Darke asked for Randy Vick's compensation package. Did she ever say to you that it was gender discrimination that she did not receive Randy Vick's compensation package?
A. Gender was never mentioned.

MS. ROBACK: I have no further questions.

FURTHER EXAMINATION
BY MR. GLENNON:
Q. Who were the males who received smaller offices than Ms. Darke or other females?

**211**

A. David Reilly, I believe; Kevin Besikof. I think they were the two that were there then.
Q. Who is David Reilly?
A. Litigation support valuation department.
Q. What's his title?
A. I'm not certain if he was a manager or not.
Q. Was he a president of a group?
A. President title was really meaningless inside our firm. President was only for Patty to go out and sell. We used our internal titles.
Q. Was he president of the litigation support group?
A. He was not the president of the litigation support group. We did not have one.
Q. Was he the head of that department?
A. Day to day, yes, but not ultimately. Lapidus created most of the revenue, sales there.
Q. Is he a director?
A. No.
Q. Was he ever offered a director's agreement?
A. No.
Q. How about Kevin Besikof, who is he? Is he related to one of the firm's founders?
A. Yes.
Q. Son?
A. Son.

**212**

Q. And who is he? What does he do?
A. He is manager in our litigation support valuation department, and he also does some work in the accounting departments as well.
Q. Has he ever been offered or presented a director's agreement?
A. I guess I could say not yet.
Q. Are those the two persons who you say got smaller offices than Ms. Darke?
A. Umm-hmm, yes.
Q. Are there other women who received larger offices than Ms. Darke or in addition to Ms. Darke, excuse me?
A. Not that I'm aware of.

MR. GLENNON: That's all I have. Thank you.
MS. ROBACK: Thank you.
MR. GLENNON: Reading and signing?
MS. ROBACK: We will read and sign, yes.
(Whereupon, at 3:56 p.m., March 6, 2007, the taking of the deposition of FARLEY KAUFMANN was adjourned.)