SHEET 1

**Page 1**

```
         UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA

PATRICIA A. DARKE,
         Plaintiff,

  -vs-           Civil File No. 06-996(PJS/RLE)

LURIE BESIKOF LAPIDUS &
COMPANY, LLP,
         Defendant.


              DEPOSITION OF
          GREGORY S. CORNMAN, JR.
              MARCH 7, 2007
                9:00 A.M.


          MARY PIERSON BRIMMER, RPR
              PIERSON REPORTING
        VOICE: 952-233-1944  FAX: 952-496-3325
            Mary.Pierson@comcast.net
```

**Page 2**

```
                   APPEARANCES
FOR THE PLAINTIFF:

     THOMAS E. GLENNON
          Attorney at Law
     THOMAS E. GLENNON & ASSOCIATES, P.A.
          4700 Wells Fargo Center
          90 South Seventh Street
            Minneapolis, Minnesota 55402

     ALSO PRESENT: Patricia A. Darke


FOR THE DEFENDANT:

     DONNA L. ROBACK
          Attorney at Law
     DONNA L. ROBACK, P.A.
          5200 Willson Road
          Suite 150
            Edina, Minnesota 55424

     ALSO PRESENT: Neil Lapidus



     The Original is in the possession of
              Attorney Thomas E. Glennon.


            * * * * *
```

**Page 3**

```
                     INDEX
EXAMINATION:
By Mr. Glennon - Pages 4, 137
By Ms. Roback - Page 136

DEFENDANT'S EXHIBITS:            PAGE MARKED:
(None marked)
```

**Page 4**

1  DEPOSITION of GREGORY S. CORNMAN, JR., taken
2  pursuant to Notice of Taking Deposition, taken at 4800 Wells
3  Fargo Center, 90 South Seventh Street, Minneapolis,
4  Minnesota, beginning at approximately 9:00 a.m., on March 7,
5  2007, before Mary Pierson Brimmer, RPR, a Notary Public in
6  the State of Minnesota.
7       WHEREUPON, the following proceedings were duly
8  had:
9
10          GREGORY S. CORNMAN, JR.,
11       called as a witness and having been first
12          duly sworn, testified as follows:
13
14              EXAMINATION
15 BY MR. GLENNON:
16   Q.  Good morning. Would you state your full name for
17 the record, please.
18   A.  Gregory S. Cornman, Jr.
19   Q.  Mr. Cornman, my name is Tom Glennon. You and I met
20 one another about 10 or 15 minutes ago for the first time, is
21 that right, sir?
22   A.  Correct.
23   Q.  To your knowledge, we have not spoken to one another
24 before nor have we been previously introduced to one another.
25 Is that your understanding, sir?

EXHIBIT 3

13
1   A. Mary and I talked in general and gave me an idea of
2 the challenges behind the position and the challenges that the
3 other HR managers faced.
4   Q. Do you know how many people she was referring to
5 when --
6   A. No, I do not.
7   Q. -- collectively referring to persons as HR managers?
8   A. I don't know the exact number.
9   Q. Do you have an idea?
10   A. I believe there were maybe three or four previous HR
11 managers while Mary was there.
12   Q. Do you know how long Ms. Franklin was at the firm?
13   A. I believe Mary was there ten years.
14   Q. Is she still employed there?
15   A. She is no longer with the firm.
16   Q. Do you know why she is no longer with the firm?
17   A. She took a new position.
18   Q. Did she talk to you about any of the reasons that
19 she had for leaving the firm?
20   A. She wanted to be able to take a vacation during the
21 winter.
22   Q. Anything else?
23   A. That was what she told me.
24   Q. You stated that she had indicated to you that
25 previous HR managers were not good fits for the job. Did she

14
1 explain what she meant by that?
2   A. She stated that one person was more geared
3 completely towards the compliance matters of human resources,
4 doing the paperwork. She stated that one other one was more
5 geared towards the employee involvement, social aspect of the
6 job and wasn't as up to speed on the compliance part of it.
7 They were missing one piece or the other needed to do the job.
8   Q. Anything else that she said about that?
9   A. No.
10   Q. You also testified that she discussed with you
11 challenges of the HR manager position.
12   A. Umm-hmm.
13   Q. What did she tell you?
14   A. We have a lot of demands for recruiting. It's a
15 very tight marketplace for accountants; that we work a lot of
16 hours, so it makes for a stressful environment for people when
17 they're working 80 hours a week during a tax season; and that
18 we have a very close-knit group of people, so we know what
19 other people are working on; and as we're trying to go through
20 the workflow, that can cause problems from now and then.
21   Q. Did she talk to you at all about any of the
22 individual partners?
23   A. She talked to me about individual partners.
24   Q. Which partners did she talk to you about?
25   A. All of them.

15
1   Q. What did she say to you about Mr. Kaufmann?
2   A. Mary has a lot of respect for Mr. Kaufmann.
3   Q. Anything else?
4   A. Very detail-oriented.
5   Q. Is there anything else?
6   A. No.
7   Q. What did she say to you about Mr. Lapidus?
8   A. Said that Mr. Lapidus can be very demanding of all
9 of his staff.
10   Q. Did she elaborate on that?
11   A. No.
12   Q. Did she share with you any previous instances in the
13 workplace involving Mr. Lapidus and employees which might meet
14 this description of very demanding on his staff?
15   A. General comments that he demanded a lot of his
16 staff.
17   Q. Anything else?
18   A. No.
19   Q. Did she inform you of any previous instances of
20 mistreatment in word or action by Mr. Lapidus directed toward
21 any member of the firm?
22   A. Toward any specific member of the firm?
23   Q. Any member of the firm.
24   A. Said that Neil could be hard on staff, yes.
25   Q. Did she talk with you about any specific instances

16
1 of him being hard on staff?
2   A. Not that I recall.
3   Q. Did she inform you that he had thrown files at
4 persons in the workplace?
5   A. She made comments along those lines.
6   Q. And that's what I'm asking you now. I'm asking you
7 if she made any remarks or made any references to any
8 incidents of either improper conduct or statements by
9 Mr. Lapidus toward any member of the firm.
10   A. She made statements that there had been files thrown
11 and that there had been yelling at staff members.
12   Q. Did she mention swearing?
13   A. No.
14   Q. Did she mention anything else other than as you've
15 testified?
16   A. Comments that Ms. Franklin made to me were along the
17 lines of yelling at staff members.
18   Q. Whether in reference to Mr. Lapidus or anyone else,
19 did she mention to you any remarks about any gender-related
20 issues involving any employee of the firm?
21   A. No gender-related issues.
22   Q. Any other employment discrimination or harassment
23 issues that she touched upon or remarked upon?
24   A. Not that I recall.
25   Q. Is there any uncertainty in your mind as to whether

WITNESS: Gregory Cornman

SHEET 5

**17**

1  or not she did so?
2  A. No.
3  Q. Does the firm have policies which deal with the
4  general subject of treating employees respectfully or with
5  dignity?
6  A. The firm within its employee handbook has a
7  harassment policy.
8  Q. Are you familiar with that policy?
9  A. Yes, I am.
10  Q. And what does the policy indicate concerning
11  harassment?
12  A. Policy indicates that the firm will not tolerate
13  harassment by any member of the firm. If harassment is
14  suspected or is being felt, they are to report to either the
15  human resources manager, the managing partner, or other member
16  of management within the firm what their concerns are. The
17  firm will then investigate fully any claims.
18  Q. Does the firm await a formal complaint by an
19  employee to conduct a harassment investigation or to otherwise
20  monitor harassment in the workplace?
21  A. If we're aware of harassment, we will investigate
22  it, whether that is through a formal complaint or through
23  information that becomes available to management.
24  Q. And who is it that needs to acquire such information
25  to prompt the firm or to cause the firm to do an

**18**

1  investigation?
2  A. It could go to a partner, it could go to the
3  managing partner, it could come to me in human resources.
4  Q. So generally speaking, if any partner in the firm is
5  aware of an act or an instance that could constitute
6  harassment, or if you, the human resource manager, become
7  aware of such information, that's deemed information
8  appropriate for the firm to conduct an investigation of some
9  kind?
10  A. Correct.
11  Q. No formal written complaint need be written in such
12  instance, is that right, sir?
13  A. Correct.
14  Q. Do you know how long this has been a policy of the
15  firm, this harassment policy that you mentioned?
16  A. It was in place before I joined the firm. I do not
17  know how long it was in place prior to me being there.
18  Q. Does the firm retain past iterations or past
19  versions of its handbook?
20  A. I'm aware of one that was dated 2003. I'm not aware
21  of prior versions of it.
22  Q. Is the 2003 version the current version?
23  A. No. The handbook was updated in 2006.
24  Q. Do you know whether or not the harassment policy was
25  changed at that time?

**19**

1  A. The harassment policy I believe was nearly intact
2  and remained the same.
3  Q. The firm has an antidiscrimination policy of some
4  form, I'm assuming, sir?
5  A. Correct.
6  Q. You're familiar with that policy?
7  A. Yes, I am.
8  Q. And what does the policy indicate?
9  A. The policy indicates the firm will not discriminate
10  based off of any of the Title VII classifications.
11  Q. When or what instances would the firm conduct an
12  investigation of a matter possibly involving or implicating
13  the Title VII protected classes?
14  A. As soon as the firm was aware of it.
15  Q. Is that the same as you described for the harassment
16  policy, that if --
17  A. Correct.
18  Q. Thank you.
19     -- that if any partner or if you as human resource
20  manager would become aware of any possible conduct or action
21  that might constitute a violation of the Title VII protected
22  categories, the firm would do a review or investigation of
23  that?
24  A. Our discrimination and harassment policies are one
25  and the same.

**20**

1  Q. And again, in this instance, it would not require a
2  formal complaint by an employee for the firm to conduct a
3  review or investigation of a matter that might constitute a
4  violation of its antidiscrimination policy?
5  A. That's correct.
6  Q. Mr. Cornman, when did you become an employee of the
7  firm?
8  A. November 16, 2004.
9  Q. Do you know when you first learned of an opening at
10  the firm for the HR manager position?
11  A. I believe that was in late September or early
12  October of 2004.
13  Q. Was it an advertisement or --
14  A. Correct.
15  Q. -- how did you learn about it being open?
16  A. It was through a newspaper advertisement.
17  Q. Were you employed at that time?
18  A. No, I was not.
19  Q. Did you have one or more than one interview with the
20  firm?
21  A. I had more than one interview.
22  Q. Do you recall when the first interview occurred,
23  sir?
24  A. No, I do not.
25  Q. Do you know with whom you met?

**49**

1  preparing the final version of it.
2     Q. And then what did you do with it vis-à-vis
3  Ms. Darke?
4     A. I don't recall if Farley gave it to her or if I gave
5  it to her.
6     Q. In what ways do you recall modifying the director's
7  agreement that was first discussed in the meeting which you
8  described earlier and that was later presented to Ms. Darke?
9     A. To account for commissions in the compensation
10 determination.
11    Q. Any other modifications?
12    A. I believe there was some issues with the general
13 agreement around noncompete and solicitation of employees that
14 I was also looking to address.
15    Q. And how did the modified form of director's
16 agreement address that?
17    A. It was to prohibit some additional actions around
18 solicitation.
19    Q. So it expanded the prohibited nonsolicitation?
20    A. It clarified what was in there and what the intent
21 of the document was.
22    Q. Did that, in your judgment, broaden the scope of the
23 nonsolicitation or the noncompete?
24    A. It would have made the nonsolicitation tighter and
25 more clear.

**50**

1     Q. But not any broader?
2     A. Not broader.
3     Q. Did the modified form of agreement contain any
4  minimum hours requirements?
5     A. I don't recall minimum hours.
6     Q. Are there any other ways in which you recall the
7  initial form of director's agreement presented to Ms. Darke
8  being modified relative to the second version?
9     A. The modifications were to address the concerns that
10 Ms. Darke had brought up.
11    Q. And it otherwise did not change in any manner, other
12 than the nonsolicitation provision, the features of the first
13 form of document presented to her?
14    A. I believe it was fundamentally the same.
15    Q. Did you have discussions with Mr. Kaufmann about
16 what the modified form of document was supposed to contain or
17 what the effect of it was supposed to be?
18    A. Yes, we were working in conjunction.
19    Q. And what did he say about that?
20    A. He said we are trying to address Patty's concerns.
21    Q. Nothing more than that?
22    A. Nothing more than that.
23    Q. You don't recall whether you or he gave the modified
24 form of agreement to her?
25    A. No, I don't recall.

**51**

1     Q. Do you know how much time she was allowed or what
2  was indicated to her as far as when a signed document was
3  requested of her?
4     A. I don't recall any time lines.
5     Q. So you don't believe that one was given to her?
6     A. I believe the statement was, "We would like to see
7  this done as soon as possible."
8     Q. Do you recall whether or not this agreement, this
9  modified form of document was given to her in April 2005?
10    A. I don't recall the timing.
11    Q. Would you believe it to have been within a matter of
12 weeks after the first meeting that you discussed with
13 Mr. Kaufmann and Ms. Darke?
14    A. I believe that once the modifications were
15 completed, it was given to her immediately.
16    Q. And do you believe that there was then a couple of
17 weeks time in between the first meeting and it being presented
18 to her?
19    A. I don't know the exact length of time.
20    Q. You don't recall months passing, though, do you?
21    A. I do not recall that.
22    Q. Did you have an understanding as to whether all
23 other persons performing director functions had signed a
24 director's agreement as of that time?
25    A. I believe signing the director's agreement was part

**52**

1  of becoming a director.
2     Q. But I'm asking about persons who are performing
3  director's functions.
4     A. Clarify the question, please.
5     Q. Sure. Whether or not they were formally admitted as
6  a director versus performing director's functions as a head of
7  the group of the firm, for example.
8        MS. ROBACK: I'll object as lack of
9  foundation.
10 BY MR. GLENNON:
11    Q. Are you aware of any person who was performing
12 director functions but who was not in fact a director?
13    A. At that time, I was only aware that all directors
14 had signed director's agreements.
15    Q. Do you know whether or not the forms of director's
16 agreements signed by the directors were the same as
17 Ms. Darke's?
18    A. They were a standardized agreement.
19    Q. And so your answer is?
20    A. Yes.
21    Q. Did all of the director's agreements in place at
22 that time contain the -- what you described as the clarified
23 nonsolicitation provision?
24    A. I have not read all the director's agreements.
25    Q. Well, you said that the document that was presented

RANDY VICK

Eden Prairie, MN 55347

Business: 612/~~342-4622~~ *842 cell*   7/89

EDUCATION:   B.S. Degree Iowa State, 1967

EXPERIENCE:

9/80 - Present

   Manager, V.P., Diversified Energies, Inc.
   Minnegasco is the 13th largest distributor of natural gas in the U.S. My responsibilities include managing nine retail appliance centers and field sales personnel throughout Minnesota.

   Accomplishments:
   o Managed sales revenues and profit goals to highest in corporate history.
   o Controlled expenses at 15% under budget.
   o Developed and instructed in-house advanced sales training.

   Dyco Petroleum Corporation is the largest independent drilling program company exploring for oil and gas in the U.S. My responsibilities were to raise drilling funds and manage corporate training.

   Accomplishments:
   o Developed northeast region of U.S. into largest territory for sales revenue outside of metro area.
   o Implemented new career development program designed to measure performance potential of all employees.
   o Coordinated advanced training for sales, marketing and administrative personnel.

12/79 - 9/80

   V.P. Sales and Marketing - Telesystem, Inc., Minnetonka, MN
   Directed all sales and marketing for business telephone inter-connect company. Hired and trained sales personnel for Minnesota, Florida and Arizona. Handled advertising, budgeting and planning for department. Exceeded all revenues and profit goals for 9 out of 10 months.

12/78 - 12/79

   Account Executive and Instructor - Wilson Learning Midwest, Edina, MN
   Sold and instructed State-of-the-Art Programs designed to improve performance of personnel at all levels within client companies. Gained thorough knowledge of behavioral sciences, aiding me in instructing heads of companies as well as other employees.

**Exhibit 3**

EXHIBIT 4

DEF-0368

3/77 - 11/78

    **Manager - Josten's Inc., Bloomington, MN**
    Coordinated marketing and sales training of managers and 400 sales people. Managed the "School Spirit" program -- motivated high school students to get involved in student activities. This improved product sales nationally by 17%.

1971 - 1977

    **Sales Representative - Golden Cycle Corporation (Realty Marketing), Colorado Springs, Co**
    Developed a national referral system in selling recreational properties and large mining claim investments.

1969 - 1971

    **Sales Representative - 3M Company, St. Paul, MN**
    Responsible for four-state territory selling "Tartan Turf" (synthetic surfacing) for professional and college football fields, running tracks and horse race tracks.

1967 - 1969

    **Commodities Salesman - Cargill Grain, Inc., Minneapolis, MN**
    Sold jumbo tank cars of refined oils throughout New England. Responsible for the hedging of futures markets with the sale of oil.

**PROFESSIONAL ACTIVITIES:**

**Instructor** - The Dale Carnegie Course of Human Relations and Dale Carnegie Sales Course (1972 to present).

**Consultant and Management Analyst** - Predictive Index (1976 to present).

**Facilitator** - Wilson Learning (1978 to present).

**Speaker** - Minnegasco's Speaker's Bureau.

**OTHER:**    **College Honors:**
        o Four-year athletic scholarship
        o President Alpha Kappa Psi, professional business fraternity

        **Graduate Studies:**
        o Securities Representative Examination
        o Principal Securities Examination
        o Dale Carnegie Management Seminar
        o Commercial Pilot Training - 1966
        o American Management Association: Time Management
        o Wilson Learning: Counselor Selling; Managing Interpersonal Relationships; Interpersonal Skills; Social Style Sales Strategies

# APPLICATION FOR EMPLOYMENT
(PRE-EMPLOYMENT QUESTIONNAIRE) (AN EQUAL OPPORTUNITY EMPLOYER)

DATE _____

## PERSONAL INFORMATION

NAME: Darke, Patricia A
(LAST, FIRST, MIDDLE)

SOCIAL SECURITY NUMBER: _____

PRESENT ADDRESS: _____ STREET, Mtka, MN 55345 (CITY, STATE, ZIP)

PERMANENT ADDRESS: same

ARE YOU 18 YEARS OR OLDER? ☑ Yes ☐ No

PHONE NO. 612-_____

APARTMENT NO. _____

IN CASE OF EMERGENCY NOTIFY: Robert Vaughan (NAME) same (ADDRESS) same (PHONE NO.) (husband)

ARE YOU PREVENTED FROM LAWFULLY BECOMING EMPLOYED IN THIS COUNTRY BECAUSE OF VISA OR IMMIGRATION STATUS? ☐ YES ☐ NO

## EMPLOYMENT DESIRED

POSITION: Sales
DATE YOU CAN START: 2 weeks
SALARY DESIRED: discussion

ARE YOU EMPLOYED NOW? yes
IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER? no

EVER APPLIED TO THIS COMPANY BEFORE? no    WHERE? _____    WHEN? _____

EVER WORKED FOR THIS COMPANY BEFORE? no    WHERE? _____    WHEN? _____

REASON FOR LEAVING: Present company is in financial distress

NAME OF LAST SUPERVISOR AT THIS COMPANY: none

WHO REFERRED YOU TO THIS COMPANY: ☐ EMPLOYMENT AGENCY ☑ NEWSPAPER ADVERTISEMENT ☐ OTHER ☐ STATE EMPLOYMENT OFFICE ☐ COLLEGE PLACEMENT SERVICE ☐ WALKED IN ☐ FRIEND

## EDUCATION

| SCHOOL LEVEL | NAME AND LOCATION OF SCHOOL | *NO. OF YEARS ATTENDED? | *DID YOU GRADUATE? | SUBJECTS STUDIED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | St Gerards | 6 | yes | |
| HIGH SCHOOL | Lincoln H.S. | 3 | yes | |
| COLLEGE | College of St. Benedict U of MN | | no | Psychology |
| TRADE BUSINESS OR CORRESPONDENCE SCHOOL | | | | |

## GENERAL

SUBJECTS OF SPECIAL STUDY OR RESEARCH WORK _____

SPECIAL TRAINING _____

SPECIAL SKILLS _____


EXHIBIT 5

DEF-0001

TOPS FORM 3288 (92-8)    *This form has been revised to comply with the provisions of the Americans with Disabilities Act and the final Regulations and interpretive guidance promulgated by the EEOC on July 26, 1991    LITHO IN U.S.A.

**FORMER EMPLOYERS** [LIST BELOW LAST THREE EMPLOYERS, STARTING WITH PRESENT ONE FIRST]

NAME AND ADDRESS OF PRESENT OR LAST EMPLOYER: Prisym Group Inc
STARTING DATE: 11-15-99  MONTH/YEAR   LEAVING DATE: 5-15-00  MONTH/YEAR

yrly STARTING SALARY: 50,000 Base + comm.   WEEKLY FINAL SALARY: to total $90,000
JOB TITLE: Vice President Sales & Marketing   MAY WE CONTACT YOUR SUPERVISOR? No
NAME AND TITLE OF SUPERVISOR:    PHONE NO.
DESCRIPTION OF WORK: Consulting company, all sales & mkgt of consultant survey tool and self
REASON FOR LEAVING: unstable company

NAME AND ADDRESS OF PRESENT OR LAST EMPLOYER: Signergy
STARTING DATE: 3 / 98   LEAVING DATE: 8 / 99

yrly STARTING SALARY: 72,500 + Bonus + car   WEEKLY FINAL SALARY: 78,500 + Bonus + car
JOB TITLE: Vice President Sales & Marketing   MAY WE CONTACT YOUR SUPERVISOR? yes
NAME AND TITLE OF SUPERVISOR: Pres. Bob Adam   PHONE NO.
DESCRIPTION OF WORK: All sales & mktg for a manufacturing company.
REASON FOR LEAVING: merger/acquisition

NAME AND ADDRESS OF PRESENT OR LAST EMPLOYER: Collector's Gallery
STARTING DATE: 4 / 96   LEAVING DATE: 2 / 98

WEEKLY STARTING SALARY: 50,000 + comm   WEEKLY FINAL SALARY:
JOB TITLE: National Sales Manager   MAY WE CONTACT YOUR SUPERVISOR? yes
NAME AND TITLE OF SUPERVISOR: owner Rob Paschal   PHONE NO. 800-383-7149
DESCRIPTION OF WORK: Kevin Hughes — all sales for a packaging company
REASON FOR LEAVING: Company moved to Chicago

**REFERENCES:** GIVE BELOW THE NAMES OF THREE PERSONS NOT RELATED TO YOU, WHOM YOU HAVE KNOWN AT LEAST ONE YEAR

| NAME | ADDRESS | BUSINESS | YEARS ACQUAINTED |
|---|---|---|---|
| 1. Linda Johnson | (h) 935-8543 will have to get these | Signergy | 2 |
| 2. Kevin Hughes | | Collectors | 4 |
| 3. Bill Smith | 704 541-0341 | Personal | 5 |
| 4. David Donaldson | 609-895-3239 | | |

**SERVICE RECORD**

BRANCH OF SERVICE:    DISCHARGE DATE / RANK:
PRESENT MEMBERSHIP IN NATIONAL GUARD OR RESERVES:   DATE OBLIGATION ENDS:

DEF-0002

## SPECIAL QUESTIONS

DO NOT ANSWER ANY OF THESE QUESTIONS IN THIS FRAMED AREA UNLESS THE EMPLOYER HAS **CHECKED** A BOX PRECEDING A QUESTION. THEREBY INDICATING THAT THE INFORMATION REQUIRED FOR A BONA FIDE OCCUPATIONAL QUALIFICATION, OR DICTATED BY NATIONAL SECURITY LAWS, OR IS NEEDED FOR OTHER LEGALLY PERMISSIBLE REASONS

☐ HEIGHT _____ feet _____ inches ☐ Are you a U.S. citizen? _____ Yes _____ No

☐ ARE YOU ABLE TO PERFORM EACH OF THE FOLLOWING JOB FUNCTIONS WITH OR WITHOUT AN ACCOMMODATION?

☒ JOB FUNCTION 1:  YES   NO

IF YOU CAN PERFORM THE FUNCTION WITH AN ACCOMMODATION, EXPLAIN HOW YOU WOULD PERFORM THE TASKS, AND WITH WHAT ACCOMMODATION?

☒ JOB FUNCTION 2:  YES   NO

IF YOU CAN PERFORM THE FUNCTION WITH AN ACCOMMODATION, EXPLAIN HOW YOU WOULD PERFORM THE TASKS, AND WITH WHAT ACCOMMODATION?

☒ WERE YOU EVER SERIOUSLY INJURED?   YES   (NO)   GIVE DETAILS

☐ WHAT FOREIGN LANGUAGES DO YOU SPEAK FLUENTLY?   READ   WRITE

☒ HAVE YOU BEEN CONVICTED OF A FELONY OR MISDEMEANOR WITHIN THE LAST 5 YEARS?   YES   (NO)   DESCRIBE

☐ I understand and agree that I may be required to take one or more ☐ physical examination: ☐ lie detector test(s) as a condition of hiring or continued employment. I agree to consent to take such test(s) at such time as designated by the Company and to release the Company, its directors, officers, agents or employees from any claim arising in connection with the use of such test(s) _____ Yes _____ No.

☐ I have been advised that lie detector tests, as a condition of hiring or continued employment, are prohibited by law.
_____ Yes _____ No

* You will not be denied employment solely because of a conviction record, unless the offense is related to the job for which you have applied.

## AUTHORIZATION

"I CERTIFY THAT ALL THE INFORMATION SUBMITTED BY ME ON THIS APPLICATION IS TRUE AND COMPLETE, AND I UNDERSTAND THAT IF ANY FALSE INFORMATION, OMISSIONS, OR MISREPRESENTATIONS ARE DISCOVERED, MY APPLICATION MAY BE REJECTED AND, IF I AM EMPLOYED, MY EMPLOYMENT MAY BE TERMINATED AT ANY TIME.
IN CONSIDERATION OF MY EMPLOYMENT, I AGREE TO CONFORM TO THE COMPANY'S RULES AND REGULATIONS, AND I AGREE THAT MY EMPLOYMENT AND COMPENSATION CAN BE TERMINATED, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE, AT ANY TIME, AT EITHER MY OR THE COMPANY'S OPTION. I ALSO UNDERSTAND AND AGREE THAT THE TERMS AND CONDITION OF MY EMPLOYMENT MAY BE CHANGED, WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE, AT ANY TIME BY THE COMPANY. I UNDERSTAND THAT NO COMPANY REPRESENTATIVE, OTHER THAN ITS PRESIDENT, AND THEN ONLY WHEN IN WRITING AND SIGNED BY THE PRESIDENT, HAS ANY AUTHORITY TO ENTER INTO ANY AGREEMENT FOR EMPLOYMENT FOR ANY SPECIFIC PERIOD OF TIME, OR TO MAKE ANY AGREEMENT CONTRARY TO THE FOREGOING."

DATE 5-15-00   SIGNATURE *Patricia Darke*

DEF-0003

# LURIE, BESIKOF, LAPIDUS & CO., LLP
### CERTIFIED PUBLIC ACCOUNTANTS

MARSHALL J. BESIKOF, CPA
NEIL N. LAPIDUS, CPA
JOEL A. LEBEWITZ, CPA
FARLEY S. KAUFMANN, CPA
HAL B. GENSLER, CPA
MARK E. ZIESSMAN, CPA
GEOFFREY H. WOLD, CPA
JEFFREY W. STARBIRD, CPA
TIMOTHY B. SCHMIDT, CPA
MARSHALL R. LEHMAN, CPA
BETH KIEFFER LEONARD, CPA
JEFFREY S. LOCKETZ, CPA
JEFFREY S. POLINCHOCK, CPA

LEE SUDIT, CPA
BRUCE I. WALLER, CPA
WILLIAM A. KAMMAN, CPA
PAUL SERBER, CPA
NORMAN ORENSTEIN, CPA
BERTRAM L. CHEZ, CPA

DAVID L. LURIE CPA
1928-1998
DAVID S. EIGER, CPA
1922-1994

2501 WAYZATA BOULEVARD
MINNEAPOLIS, MINNESOTA 55405-2197
INTERNET ADDRESS www.lblco.com

TELEPHONE 612-377-4404
FACSIMILE 612-377-1325

MEMBER OF

AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

SEC PRACTICE SECTION
PRIVATE COMPANIES PRACTICE SECTION

FOUNDING MEMBER FIRM,
THE LEADING EDGE ALLIANCE

WITH AFFILIATED FIRMS IN PRINCIPAL U.S.
AND INTERNATIONAL CITIES

June 6, 2000

Ms. Patricia Darke
17101 Lake Street
Minnetonka, MN 55345

Dear Patricia:

This letter confirms the terms of employment with us beginning July 10, 2000. The terms are as follows:

- Lurie, Besikof, Lapidus & Co., LLP will compensate you for the first year at $50,000 base salary plus 20% commission on Predictive Index sales. You will also be eligible, per the Fee Commission Program mentioned in the Employee Benefits Handbook, on new client referrals. This compensation schedule can be re-structured, per your request, in one year to lower your base salary and increase the commission percentage.

- You will be eligible for all of our employee benefit programs after completing certain eligibility periods as follows:

  - Currently we offer major medical and health insurance through Medica. You will be eligible for medical coverage beginning August 1, 2000. Depending on the plan you choose, the employee contribution is from $109.00 to $128.00 per month for single coverage and from $286.00 to $337.00 per month for family coverage, which represents 50% of the total premium. You will also be eligible for our cafeteria plan on the same day you qualify for medical coverage as well as for our Long Term Disability program, at no cost to you. Through the cafeteria plan, you may elect to have certain dependent care, medical costs and medical premiums paid with an off-setting pre-tax salary reduction.

PD 0451

EXHIBIT 6

- After six months of service, you will be eligible to participate in our Firm's 401(k) plan.

- After you have been with the Firm six months, you will be enrolled in the AICPA group-term life insurance plan, at no cost to you. This insurance is generally established at a level of twice an employee's salary.

- After you have been with the Firm six months, the Firm will help finance the purchase of a home computer system. The amount is repaid to the Firm over a period not to exceed 36 months, through payroll deductions. This program is completely optional.

- Our Firm does offer direct deposit of your payroll check.

- Our Firm currently observes six national holidays of New Year's, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas Day and offers two personal days.

- You will also immediately begin earning two weeks vacation per annum at the rate of 6.67 hours per month. The vacation time begins to vest after you have been with the Firm six months. In addition, you will be able to take additional compensatory time off as your work schedule permits.

- We also offer all employees up to 25% of first year fees collected (15% in the subsequent five years), for new clients brought into our Firm through your contacts.

We look forward to you joining the Predictive Index division of Lurie, Besikof, Lapidus & Co., LLP.

Sincerely,

Tiffany A. Skinner
Human Resources Manager

Rev.12/99       **EMPLOYEE TRANSACTION SHEET**       EMP-002

NAME: _Patricia A. Dauker_     EFFECTIVE DATE: _7/24/00_

PREDICTIVE INDEX SURVEY: _____    CREDIT REPORT: _____

POSITION: _PI Consultant_

- [x] Hired
- [ ] Terminated
- [ ] Resigned
- [ ] Change of Classification
- [ ] Salary Change
- [ ] Leave of Absence
- [ ] Maternity Leave
- [ ] Disability Leave

**EMPLOYMENT CLASSIFICATION** (Refer to Benefits Spreadsheet):

| | | |
|---|---|---|
| X | Full time / Professional / Exempt | PI Consultant |
| | Full time / Intern or Temporary / Professional / Exempt | Expected completion: |
| | Less than full time / Professional / Exempt | Hours contracted: |
| | Full time / Support Staff / Non-Exempt | |
| | Full time / Temporary Support Staff / Non-Exempt | Expected completion: |
| | Part time / 28+ hours per week / Support Staff / Non-Exempt | Hours per week: |
| | Part time / -28 hours per week / Support Staff / Non-Exempt | Hours per week: |
| | Seasonal / Hourly | |

| SALARY | | COMMENTS |
|---|---|---|
| ANNUALLY | $50,000 | $50,000 + commission (see offer) |
| MONTHLY | | |
| HOURLY | | Administrator          Partner |

ROUTE TO:
Judy Norstrem
File

EXHIBIT 7

DEF-0010

Rev. 12/99     **EMPLOYEE TRANSACTION SHEET**     EMP-002

NAME: _Patricia Darke_     EFFECTIVE DATE: _7/16/02_

PREDICTIVE INDEX SURVEY: _____ CREDIT REPORT: _____

POSITION: _____

- ☐ Hired
- ☐ Terminated
- ☐ Resigned
- ☐ Change of Classification
- ☒ Salary Change
- ☐ Leave of Absence
- ☐ Maternity Leave
- ☐ Disability Leave

**EMPLOYMENT CLASSIFICATION** (Refer to Benefits Spreadsheet):

| | | |
|---|---|---|
| X | Full time / Professional / Exempt | |
| | Full time / Intern or Temporary / Professional / Exempt | Expected completion: |
| | Less than full time / Professional / Exempt | Hours contracted: |
| | Full time / Support Staff / Non-Exempt | |
| | Full time / Temporary Support Staff / Non-Exempt | Expected completion: |
| | Part time / 28+ hours per week / Support Staff / Non-Exempt | Hours per week: |
| | Part time / -28 hours per week / Support Staff / Non-Exempt | Hours per week: |
| | Seasonal / Hourly | |

$5000

| SALARY | | COMMENTS |
|---|---|---|
| ANNUALLY | 55,000 | Salary Sch. review for Nov 02 & May 03 |
| MONTHLY | | |
| HOURLY | | Administrator _____ Partner _JC_ |

| ROUTE TO: | |
|---|---|
| Judy Norstrem | |
| File | |

DEF-0009



Name: Patricia Do__
Address: Minnetonka, MN 55345

Date started: 7/31/00
Date left:

SS #:
B-Day:
Telephone:

Position: PT Sales Consultant
Reason:

| Date | Monthly | Annual | |
|---|---|---|---|
| 7/31/00 | 4,166.66 | 50,000 + Comm. | |
| 8/12/02 | 4583.05 | 5500 + 20% commiss. | |
| 11/01/02 | 4833.33 | 58,000 + 20% Comm. | Bus Winning Mktg Monthly Annual |

DEF-0125