UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

PATRICIA A. DARKE,                                 Case No. 06-CV-0996 (PJS/RLE)

                         Plaintiff,

v.                                                 ORDER

LURIE BESIKOF LAPIDUS
& COMPANY, LLP,

                         Defendant.

---

Thomas E. Glennon, GLENNON LAW OFFICE, for plaintiff.

Donna L. Roback, DONNA L. ROBACK, P.A., for defendant.

Plaintiff Patricia Darke brings claims for breach of contract, sex discrimination, and unlawful retaliation against her former employer, defendant Lurie Besikof Lapidus & Co. ("Lurie Besikof"). Lurie Besikof moves for summary judgment. For the reasons that follow, the Court grants Lurie Besikof's motion.

## I.  BACKGROUND[1]

Darke is an experienced sales and marketing professional. Lurie Besikof is an accounting and consulting firm with about 100 professionals who work in different practice areas. The "Leadership Group" within Lurie Besikof specializes in selling and servicing the "Predictive Index," a survey instrument used in evaluating and developing managers,

---

[1]Because Lurie Besikof moves for summary judgment, the Court recounts the facts in the light most favorable to Darke (to the extent that admissible evidence supports Darke's version of the facts).

-1-

professionals, and executives.  As of early 2000, two professionals made up the Leadership

Group: Randy Vick, the head of the group, and Chad Stelljes, who worked under Vick.

Darke applied to replace Stelljes in May 2000.  At the time, Darke was the vice president

of new business development at a financially unstable consulting firm and was looking for a

more secure position.  Glennon Aff. Ex. 1 ("Darke Dep.") at 22-23 [Docket No. 22].  Before

being offered Stelljes's old job, Darke interviewed with various Lurie Besikof employees and

partners, including the firm's managing partner, Farley Kaufmann.  *Id.* at 26.  Darke told

Kaufmann that she wanted to make $90,000 a year.  *Id.* at 34-35.  Kaufmann outlined in writing

a pay package made up of a base salary plus commissions that would net her close to $90,000

annually, provided that she made at least $80,000 worth of Predictive Index sales and generated

$80,000 worth of business for other groups at Lurie Besikof.  *Id.* at 35; Roback Aff. Ex. 14

[Docket No. 15].  Kaufmann also told Darke that she would be first in line for Vick's job and

that, if and when she replaced Vick, Darke would get his compensation package (whatever that

was).  Darke Dep. at 40, 43; Glennon Aff. Ex. 2 ("Kaufmann Dep.") at 77.

On June 6, 2000, Lurie Besikof sent Darke an offer letter that formalized the terms of her

employment.  Roback Aff. Ex. 6.  The letter specified Darke's base salary ($50,000) and her

commission rate on Predictive Index sales, as well as her entitlement to fringe benefits.  The

letter further provided that Darke could renegotiate her compensation in a year to decrease her

base salary and increase her commission rate.  The offer letter said nothing about the prospect of

Darke's replacing Vick or how she would be compensated if she did.

Darke accepted the terms of the offer letter and began working for Lurie Besikof in July

2000.  Darke Dep. at 26-28.  For the next three years, while she worked under Vick, Darke

regularly complained that she was underpaid.  *Id.* at 78-79; Kaufmann Dep. at 101-03.  In May
2003, Vick resigned, and Darke replaced him.

Darke asked for Vick's compensation package once she knew that she would be getting
his job, but Kaufmann told her that it was not "available."  Kaufmann Dep. at 103; Darke Dep.
at 42.  The most significant differences between the compensation package that Vick had
enjoyed and the compensation package that Darke was offered were the commission percentages
and bases.  Vick had been paid a commission of thirty-four percent or higher on his own sales
and five percent on sales by other members of the Leadership Group.  After Darke took over for
Vick, she was paid a commission of nineteen to twenty-one percent on all sales by members of
the Leadership Group — including her own sales.  Roback Aff. Ex. 8 at PD0167.

Kaufmann justified the differences in two ways.  According to Greg Cornman, Lurie
Besikof's human-resources manager in 2004, Kaufmann said that Darke was not given Vick's
compensation package because it was too expensive.  Glennon Aff. Ex. 3 ("Cornman Dep.") at
44.  Kaufmann, however, testified at his deposition that Vick's compensation package, based as
it had been on his own sales (rather than on sales by the Leadership Group), had fostered
unhealthy competition between Vick and Darke.  Kaufmann Dep. at 105.  Kaufmann also told
Darke, shortly before she took over Vick's job, "You will be treated fairly and I am confident
your income will be increasing significantly.  We may want to change the system so there is no
competition between you and the new person."  Darke Aff. Ex. 3 [Docket No. 21].  Kaufmann
advised Lurie Besikof's management committee that, to minimize the risk of rivalry within the
Leadership Group, Darke (and anyone under her) should be paid commissions on the group's
sales, and the committee agreed.  Kaufmann Dep. at 105.  During the period when Darke ran the
Leadership Group, two different women filled Darke's previous position (as the number two

person in the Leadership Group) for intervals of a few months.  *Id.* at 54-56.  Thus, after May 2003, Darke was sometimes (but not always) the only professional in the Leadership Group.  *Id.* at 56.

Darke continued to complain about her pay and to reiterate that she wanted Vick's compensation package.  Darke specifically told Lurie Besikof that she wanted to be paid the same as her "male predecessor."  Darke Dep. at 79.  Lurie Besikof denied her requests.  At some point in early 2005, Kaufmann grew weary of Darke's complaints and directed her to bring her compensation-related concerns to Cornman rather than to Kaufmann.  *Id.* at 50; Kaufmann Dep. at 112, 134-35.

Notwithstanding Darke's complaints about her pay, Lurie Besikof was generally pleased with her work, and in July 2004 the firm gave her the title of "President" of the Leadership Group.  At the same time, Lurie Besikof invited Darke to become a "Director" of the firm. Kaufmann Dep. at 139-40; Darke Dep. at 47.  Directors are senior non-partner employees who are given the honorific title of "Director" and allowed to participate in a directors-only retirement plan.  To become a director, a Lurie Besikof employee must sign a "Director's Agreement" that includes, among other things, a minimum-hours requirement and a noncompete clause.

Kaufmann provided Darke a draft director's agreement in November 2004.  Darke Dep. at 48.  Darke did not sign the agreement, however, because she believed that the agreement was not well suited to her position.  Although the agreement was the standard agreement signed by other directors, Darke told Kaufmann that she was not a typical employee, as she earned most of her income through commissions rather than billable hours.  Kaufmann Dep. at 137-38, 145-47; Cornman Dep. at 46-47.

-4-

In response to Darke's concerns about the November 2004 director's agreement, Lurie Besikof provided her a revised agreement in April 2005. That revised agreement included a higher minimum-hours requirement (2280 hours) than the November 2004 agreement (2080 hours). *Compare* Darke Aff. Ex. 6 *with* Darke Aff. Ex. 7. The April 2005 agreement also included a different, somewhat stricter noncompete clause than the earlier agreement.

After consulting with a lawyer, Darke refused to sign the April 2005 agreement. She told Lurie Besikof that the noncompete clause was so restrictive that, on balance, the directorship was not attractive to her. Darke Dep. at 49-51; Darke Aff. ¶ 10; Kaufmann Dep. at 146-51.

In response to Darke's refusal to sign the agreement, Cornman (Lurie Besikof's human-resources manager) threatened to fire Darke and told her that she was demoted. Darke Dep. at 50-51, 56-57, 107-09; Darke Aff. ¶¶ 9-10. Darke protested to Kaufmann (Cornman's boss), who disavowed Cornman's threats. Kaufmann assured Darke that she was not demoted, that she would not be fired, and that she was a valuable employee whom Lurie Besikof wanted to keep. Kaufmann assured Darke that, if Cornman had told her otherwise, Cornman had exceeded his authority and did not speak for Lurie Besikof. Kaufmann Dep. at 187-96.

Darke maintains that she was in fact demoted, notwithstanding Kaufmann's assurances to the contrary. Darke Dep. at 56-57, 107-09. As evidence of her demotion, Darke contends that she was excluded from two activities in which she should have participated as President of the Leadership Group: first, regular management meanings, and second, interviewing an applicant for an opening in the Leadership Group (Mary-Rose Iten, who ended up replacing Darke). Darke Aff. ¶ 11.

Kaufmann's reassurances were not enough for Darke. On May 16, 2005, a few days after the conversations with Kaufmann in which he disavowed Cornman's threats, Darke submitted

her resignation letter.  Roback Aff. Ex. 11.  Kaufmann responded the next day, in writing, and

asked Darke to reconsider.  Roback Aff. Ex. 12.  She declined to do so.  Instead, she filed this

lawsuit in March 2006.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute

over a fact is "material" only if its resolution might affect the outcome of the suit under the

governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a

verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir.

2006).  In considering a motion for summary judgment, a court "must view the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to the

non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir.

2004).

### B.  Breach of Contract

Darke contends that Lurie Besikof breached a contract with her by breaking two

promises.  First, Darke contends that she was promised compensation similar to that of Stelljes

when she replaced him at Lurie Besikof in 2000.  Second, Darke contends that she was promised

Vick's compensation package if and when she replaced him.[2]  Compl. ¶ 8 [Docket No. 1]; *see also* Darke Dep. at 67.

Lurie Besikof counters that Darke's breach-of-contract claims fail because she had no employment contract.  Mem. Supp. Def. Mot. S.J. ("Def. SJ Mem.") at 10 [Docket No. 14].  This argument  rests on the perplexingly common misconception that at-will employees (such as Darke) do not have contracts of any kind with their employers.  But "at-will employment" is not "employment in the absence of a contract."  Rather, it is employment under a contract (oral or written) that is not for a fixed term and that can be terminated by either party.[3]  Virtually every employment relationship includes, at a minimum, an agreement — that is, a contract — that the employee will do certain work in return for certain compensation.

The key terms of Darke's employment contract are specified in her job application and in the offer letter that Lurie Besikof sent to her on June 6, 2000.  The job application provides:

---

[2]Darke also appears to raise a freestanding claim for "constructive termination."  Compl. ¶ 15 ("As a direct and proximate result of defendant [Lurie Besikof's] afore-described breaches of contract *and constructive termination* of [her] employment, Darke has incurred damages and is entitled to receive compensation . . . .") (emphasis added); Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 18-19 [Docket No. 23].  The law does not recognize such a claim.  Firing an employee, whether actually or constructively, is not unlawful unless a contract or statute makes it so.  Darke acknowledges that she was an at-will employee, so Lurie Besikof breached no contract even if it constructively terminated Darke's employment.  *See* Darke Dep. at 24, 103-04.  The Court will discuss Darke's constructive-termination allegations as they relate to her statutory claims below.

[3]*See Walker v. Abbott Labs.*, 340 F.3d 471, 476 (7th Cir. 2003) ("[C]ourts have found that at-will employment, though capable of being terminated by either party at any time, is nonetheless a contractual relationship.*"); Skinner v. Maritz, Inc.*, 253 F.3d 337, 341-42 (8th Cir. 2001) (holding that under Missouri law, "in an at-will employment relationship either party may end the relationship at any time without any need to show cause.  This cannot be taken to mean that at-will employees are bereft of any and all contractual rights, e.g., the right to treat the employer's failure to pay for work done by the employee prior to termination of the employment relationship as a breach of contract.").

> In consideration of my employment, I agree . . . that my
> employment and compensation can be terminated, with or without
> cause, and with or without notice, at any time, at either my or the
> company's option.  I also understand and agree that the terms and
> condition[s] of my employment may be changed, with or without
> cause and with or without notice, at any time by the company.

Roback Aff. Ex. 5 at DEF-0003.[4]  The offer letter spells out the specifics of Darke's

compensation and benefits in her first year.  The letter also addresses Darke's future

compensation by providing:  "This compensation schedule can be re-structured, per your

request, in one year to lower your base salary and increase the commission percentage."  Roback

Aff. Ex. 6 at PD-0451.

Darke argues that her contract with Lurie Besikof contains two compensation-related

promises not found in her offer letter: that she would be paid like Stelljes to start, and like Vick

when she replaced him.  Darke Dep. at 67.  Given that the offer letter covers in detail how Darke

was to be compensated — both initially and in the future — it appears that Minnesota's parol-

evidence rule would forbid Darke from introducing evidence of the two oral promises on which

her breach-of-contract claim rests.[5]  But Lurie Besikof has not made this (strong) argument,

perhaps because it conflicts with the firm's (weak) argument that Darke had no contract at all.

The Court will therefore not consider it further.

---

[4]This clause is in all capital letters in the job application; the court reproduces it here in upper and lower case for the sake of legibility.

[5]See *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003) (stating general rule); *Telex Corp. v. Balch*, 382 F.2d 211, 215-16 (8th Cir. 1967) (holding that under Minnesota law, even when an agreement is incomplete, parol evidence is admissible only if "it relates to a non-collateral agreement and not one germane to the subject matter of the writing"); *Jimmerson v. Troy Seed Co.*, 53 N.W.2d 273, 276 (Minn. 1952) ("Under no circumstances is it permissible to prove [a] contract incomplete by going outside the writing and proving that there was an oral *non-collateral* stipulation entered into not contained in the written agreement.") (footnote omitted).

CASE 0:06-cv-00996-PJS-RLE   Document 37   Filed 02/07/08   Page 9 of 28

Lurie Besikof does, however, argue that Darke's claims fail because she agreed, by signing the job application, that Lurie Besikof had the right to unilaterally change the terms of her compensation.  Def. Reply at 7 [Docket No. 33].  The Court agrees.  The June 2000 offer letter set forth Darke's initial compensation scheme.  Even if that scheme was less generous than Stelljes's — an issue on which the evidence is extremely thin[6] — the offer letter represented a permissible modification of the terms of Darke's employment.  And even if Lurie Besikof promised Darke that she would get Vick's compensation package when she replaced him, Lurie Besikof also reserved the right to change its mind, and to do so without advance notice to Darke. Lurie Besikof therefore did not breach any contract with Darke when it offered her a compensation package different from the one Vick had received.

A portion of Darke's breach-of-contract claims fails for the additional reason that it is untimely.  Darke contends that Lurie Besikof deliberately (i.e., willfully) underpaid her, and the undisputed facts support her contention.  (Lurie Besikof does not contend, for instance, that it made a mistake in setting Darke's pay.)  Darke's breach-of-contract claims are therefore subject to a three-year statute of limitations under Minnesota law.  Minn. Stat. § 541.07(5).  If Lurie Besikof underpaid Darke relative to Stelljes and thereby breached a contract with her, that

---

[6]The sole evidence on this point is a statement in the affidavit of Tiffany Walz, who was Lurie Besikof's human-resources manager when Darke was hired.  Walz says:  "During my employment as [Lurie Besikof's] Human Resources Manager, I became aware that Ms. Darke was earning less in her position of employment than her predecessor (Mr. Chad Stelljes), notwithstanding the fact that Ms. Darke was doing more work than Mr. Stelljes."  Walz Aff. ¶ 3 [Docket No. 20].  The Court will assume, for the sake of argument, that Walz has sufficiently explained the basis for her personal knowledge of this pay disparity by saying that she was Lurie Besikof's human-resources manager.  The Court will also assume, again for the sake of argument, that Walz's statement sufficiently alleges that Stelljes was paid at a higher *rate* than Darke, and not simply paid a higher amount.  After all, Darke could have been paid at the same rate as Stelljes and still earned less had she made fewer sales than he, which would not represent a difference in their compensation *schemes*.

-9-

breach occurred in 2000, and any claim for that breach is untimely.  Darke's claim with respect

to Vick's compensation did not accrue until May 2003 or later, however, and that claim is

therefore not untimely (this suit was filed in March 2006).

Finally, although Darke's complaint does not raise a claim for promissory estoppel, Lurie

Besikof argues that Darke's contract claims fail if they are construed as promissory-estoppel

claims.  Def. SJ Mem. at 10-14.  In response, Darke has not attempted to argue that she has a

promissory-estoppel claim that should survive summary judgment.  The Court therefore deems

any promissory-estoppel claim to have been abandoned (if one was ever raised, which is

doubtful).

## C.  Sex Discrimination

Darke contends that Lurie Besikof violated Title VII and the Minnesota Human Rights

Act ("MHRA") by discriminating against her on the basis of sex.  Title VII forbids an employer

to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  The MHRA includes a

similar ban on sex discrimination.  Minn. Stat. § 363A.08 subd. 2.

Courts have traditionally discussed two methods of proving sex discrimination under

Title VII:  (1) the direct method and (2) the indirect method — that is, the method described in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).[7]  *See, e.g.*, *Rogers v. City of*

---

[7]Courts have sometimes stated that all claims under the MHRA must be analyzed under
the indirect method.  *See Klyuch v. Freightmasters, Inc.*, 393 F. Supp. 2d 788, 792 (D. Minn.
2005); *Zhuang v. Datacard Corp.*, No. 03-1026, 2004 U.S. Dist. LEXIS 16718, at *27 (D. Minn.
Aug. 23, 2004); *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626-27 (Minn.
1988) ("Courts of this state should continue to apply the *McDonnell Douglas* analysis in
employment cases involving claims of disparate treatment brought under the Minnesota Human

*Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003).  Which method is appropriate is said to depend on the nature of the plaintiff's evidence.  When a plaintiff has what is called "direct evidence," she proceeds under the direct method of proof — that is, she simply submits her evidence, and does not rely on the three-part *McDonnell Douglas* framework.  Otherwise, her claim is examined under *McDonnell Douglas*.

There is some confusion in recent Eighth Circuit case law as to what "direct evidence" means.[8]  Some cases treat "direct evidence" as being the opposite of "circumstantial evidence," which has led to statements like this:  "Because [the plaintiff] presented no direct evidence of

---

Rights Act regardless of whether a claim has the label of being a 'single-motive' or 'mixed-motive' case.").  But it is not clear whether courts really mean this.  If, for example, a case involved an explicit admission by an employer that it fired an employee because she was female or African-American, it would not make sense to apply the *McDonnell Douglas* framework.  In this case, though, the question is academic, as no such evidence of discrimination exists.

[8]*Compare Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007) ("To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence. . . . Where the plaintiff presents only circumstantial evidence of discrimination, as Carraher does in the instant case, we apply the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*. ") *and Bakhtiari v. Lutz*, 507 F.3d 1132, 1138 (8th Cir. 2007) (Shepherd, J., concurring in part) ("When a plaintiff produces direct evidence of discrimination or retaliation, the *McDonnell Douglas* burden-shifting analysis need not be employed. . . .  Circumstantial evidence cases are different . . . .  Because this is a circumstantial evidence case, I agree that the *McDonnell Douglas* burden-shifting analysis governs Bakhtiari's retaliation claim . . . .") *with Carraher*, 503 F.3d at 720 (Beam, J., dissenting and concurring) ("Evidence establishing a specific link to alleged discriminatory animus may be totally circumstantial yet wholly sufficient without use of the *McDonnell Douglas* paradigm.  Accordingly, a holding purporting to require the *McDonnell Douglas* burden-shifting analysis when a plaintiff presents 'only circumstantial evidence,' is, after *Desert Palace* [*Inc. v. Costa*, 539 U.S. 90 (2003)], imprecise.") *and Bakhtiari*, 507 F.3d at 1135-36 ("Because there is no evidence, direct or circumstantial, showing a specific link between Bakhtiari and any alleged retaliatory practices prohibited by Title VII, the burden-shifting analysis set forth in [*McDonnell Douglas*] applies.") (quotations and footnote omitted).

intentional age discrimination, but rather based his claim solely on circumstantial evidence, we apply the well-known *McDonnell Douglas* analytical framework." *Mayer v. Nextel West Corp.*, 318 F.3d 803, 806 (8th Cir. 2003).

The problem with such statements is that evidence cannot be neatly sorted into two categories: "direct" and "circumstantial." In reality, *all* evidence is "circumstantial," in the sense that *all* evidence requires the factfinder to make inferences. Even the most "direct" of direct evidence requires the factfinder to make inferential leaps of some kind. For example, the testimony of a witness at a murder trial that she saw the defendant shoot the victim does not prove that the defendant committed the murder unless the jury makes inferences, such as that the eyewitness is sane, and that the eyewitness was not dreaming, and that the defendant and victim did not stage a fake murder. What distinguishes "direct" evidence from "circumstantial" evidence, then, is not that one requires inferences while the other does not, but rather the number and nature of the inferences that are required.

Put another way, all evidence can be plotted along a continuum. At one pole of the continuum is strong evidence — evidence that requires the factfinder to make inferential leaps that are very few and very short. At the other pole of the continuum is weak evidence — evidence that requires the factfinder to make inferential leaps that are very many and very long. When judges and lawyers refer to "direct" evidence, they are simply using shorthand to refer to evidence that is on the stronger end of the continuum, and when they refer to "circumstantial" evidence, they are likewise using shorthand to refer to evidence that is on the weaker end of the continuum. Thus, "direct" evidence is not the *opposite* of "circumstantial" evidence; it is, instead, *very strong* circumstantial evidence.

The Eighth Circuit recognized that direct evidence is not the opposite of circumstantial evidence in *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)  — the key Eighth Circuit decision addressing proof in discrimination cases.  In *Griffith*, Chief Judge Loken, writing for the Court, emphasized that "[d]irect evidence in this context [i.e., in the context of a discrimination case] is *not* the converse of circumstantial evidence, as many seem to assume." 387 F.3d 733, 736 (8th Cir. 2004) (emphasis added).  Instead, "'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."  *Id.  McDonnell Douglas* sets forth a method by which weaker evidence is considered — evidence that is commonly labeled "circumstantial," because it requires inferential leaps that are substantial in number or length. But *McDonnell Douglas* is inapposite when the plaintiff has stronger evidence.  As Chief Judge Loken wrote:  "[A] plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial."  *Id.*

In short, it is misleading to say that the direct method of proving discrimination applies when the plaintiff has "direct" evidence, and that the indirect or *McDonnell Douglas* method applies when the plaintiff has "circumstantial" evidence.  Rather, the direct method applies when the plaintiff does not *need* the *McDonnell Douglas* framework because she has strong evidence of discrimination.  But when the plaintiff's evidence is weaker, *McDonnell Douglas* gives the Court a framework for analyzing whether the evidence is nevertheless sufficient to support a verdict of discrimination.

The evidence of discrimination in this case is exceedingly weak.  Accordingly, Darke's Title VII claims will be analyzed under the indirect method, using the familiar three-step

*McDonnell Douglas* framework.[9]   At step one, the employee must establish a prima facie case of discrimination, which entails showing: (1) that she is a member of a protected class; (2) that she was qualified for the position in question or (depending on the type of case) was meeting her employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007); *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004).   An inference of discrimination arises, at the prima facie stage, if similarly situated employees outside of the protected class did not suffer the challenged adverse action. *Wheeler*, 360 F.3d at 857.   If an employee makes out a prima facie case, the employer has a burden of production to provide a legitimate nondiscriminatory explanation for the adverse action. *Elnashar*, 484 F.3d at 1055. The burden then shifts to the employee to establish that the employer's proffered explanation is pretextual and that discrimination is the real reason for the adverse action. *Id.*

Darke's sex-discrimination claims fail for three reasons.  First, to the extent that her claims are based on pay discrimination, they are untimely.  Second, with respect to much of the conduct that Darke challenges, no reasonable jury could find that the conduct amounted to adverse employment action.  Third, even if Darke suffered adverse employment action, she has failed to create a genuine issue of fact as to whether Lurie Besikof's explanation for its treatment of her is a pretext for sex discrimination.  The Court will address each alleged adverse action in turn.

---

[9]Because, as noted earlier, MHRA claims are also analyzed under the indirect method, the Court will focus primarily on Title VII and will discuss the MHRA separately only in connection with Darke's pay-discrimination claims.

1.  Pay Discrimination

Darke contends that, because she is a woman, she was paid less than Stelljes and Vick when she took over for each of them.  Lurie Besikof responds that Darke's pay-discrimination claims are untimely under *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007). Def. SJ Mem. at 15-16.  Lurie Besikof further contends that it has proffered a legitimate nondiscriminatory explanation for any pay disparity, and that Darke has not pointed to any evidence from which a jury could conclude that Lurie Besikof's explanation is pretextual.  *Id.* at 18, 22-24.  The Court agrees with Lurie Besikof on both points.

*a.  Timeliness*

Under Title VII, employees must present their discrimination claims to the Equal Employment Opportunity Commission ("EEOC") before filing suit.  42 U.S.C §§ 2000e-5(e)(1), (f)(1); *Ledbetter*, 127 S. Ct. at 2166.  Employees who wait too long (more than 180 or 300 days, depending on the state) to file an EEOC charge regarding an employer's discriminatory act lose the right to challenge that act in court.  *Ledbetter*, 127 S. Ct. at 2166-67.  The parties agree that in this case, Darke had 300 days after a discriminatory act by Lurie Besikof within which to file a charge with the EEOC challenging that act.  Def. SJ Mem. at 15; Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 21 n.6 [Docket No. 23].

The Supreme Court held in *Ledbetter* that in pay-discrimination cases, "[b]ecause a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs."  127 S. Ct. at 2165.  The first "pay-setting decision" at issue in this case took place in June 2000, when Darke was hired to replace Stelljes.  The second decision took place in July 2003, when Lurie Besikof established how Darke would be compensated as Vick's

replacement.  Roback Aff. Ex. 8 at PD0167.[10]  Darke does not dispute Lurie Besikof's contention

that she first filed a charge with the EEOC on January 18, 2006, two and one-half years after

Lurie Besikof decided what to pay Darke for Vick's position and about five and one-half years

after Lurie Besikof decided what to pay Darke for Stelljes's position.  *See* Def. SJ Mem. at 15.

Darke's Title VII pay-discrimination claims are therefore plainly untimely under *Ledbetter*, and

Darke's allegations of workplace-wide sex discrimination cannot alter this conclusion.

Whether Darke's claim for pay discrimination under the MHRA is similarly untimely is

less obvious because no Minnesota court has yet adopted or rejected the analysis in *Ledbetter*.  If

the MHRA were interpreted so that each paycheck resulting from a discriminatory pay-setting

decision was deemed to be a discrete, actionable discriminatory act — an approach rejected in

*Ledbetter*, 127 S. Ct. at 2165 — then Darke's pay-discrimination claims based on paychecks

postdating January 18, 2005 would not be time-barred.[11]  This Court finds, however, that the

Minnesota Supreme Court is likely to follow *Ledbetter* in interpreting the MHRA, given that

Minnesota courts have a long history of interpreting the MHRA to be consistent with Title VII.

*See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 624 (Minn. 1988) ("[I]n the

past we have generally applied to our Human Rights Act the interpretation federal courts have

applied to cases arising under Title VII."); *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 921

(Minn. Ct. App. 1999) ("In interpreting cases under the Minnesota Human Rights Act, we give

---

[10]Although Darke took over for Vick in late April or early May 2003, her compensation package for Vick's position was not established until July 8.  The compensation package was made retroactive to May 1, 2003.  Roback Aff. Ex. 8 at PD0167.

[11]Whereas Title VII requires an employee in a state such as Minnesota to file a charge with the EEOC within 300 days of a challenged discriminatory act, the MHRA gives employees a year after a challenged act within which to file a charge of discrimination with the state.  Minn. Stat. § 363A.28 subd. 3.

strong weight to federal court interpretations of Title VII claims because of substantial similarities between the two statutes."). The Court therefore finds that Darke's MHRA claims for pay discrimination are untimely.

### b. Pretext

Lurie Besikof offers two different explanations for the difference between Vick's and Darke's compensation.[12] First, Lurie Besikof argues that Vick was significantly better qualified and more experienced than Darke. Def. SJ Mem. at 18. Although Lurie Besikof offers this argument to demonstrate that Darke and Vick are not similarly situated for purposes of Darke's prima facie case, the Court finds that this argument supplies a legitimate nondiscriminatory explanation for the challenged pay disparity. Darke has not disputed Vick's credentials or experience, nor has she offered any evidence that Lurie Besikof's explanation is pretextual, except to say that Darke was a better employee than Vick. Pl. SJ Opp. at 24. That may be true, but it does not show pretext. Wages often rise with time, and thus senior employees are often paid more than less-experienced employees doing the same work with the same title, regardless of who actually does a better job.

---

[12]Lurie Besikof also asserts that Darke was in effect paid *more* than Vick. Def. SJ Mem. at 13. There is no record support for this assertion, and Lurie Besikof conceded at oral argument that the assertion rests on attorney work product that the firm did not produce. *See also* Cornman Dep. at 60-65 (Lurie Besikof's attorney asserting work-product immunity over an analysis by Kaufmann of Darke's hypothetical pay had she received Vick's compensation package).

With respect to Stelljes, Lurie Besikof did not offer any explanation for the alleged difference between his pay and Darke's. It is not entirely clear whether Darke in fact seeks to recover for pay discrimination based on any disparity between her pay and Stelljes's pay. But in any case, Darke cannot recover for any such claims because they are time-barred even if the MHRA is not governed by *Ledbetter*. Darke received her last paycheck for Stelljes's position some time in 2003, around three years before she filed her discrimination charge.

Second, Lurie Besikof argues that the compensation structure for Leadership Group professionals was changed when Vick left to reduce intra-group competition.  Def. SJ Mem. at 22-23.  Darke contends that this explanation must be pretextual because, at the time she took over for Vick, she was the only employee in the group.  Pl. SJ Opp. at 25.  But this fact alone is insufficient for a reasonable jury to find that Lurie Besikof's competition-reduction rationale is pretextual.  It is undisputed that Lurie Besikof usually had at least two employees in the Leadership Group: first Vick and Stelljes, then Vick and Darke, then Darke and Rachel Peters, then Darke and Lynn Mallory, then Mary-Rose Iten and Laura Prieve.  Kaufmann Dep. at 54-56; Cornman Dep. at 30-32, 119.  Kaufmann testified that Lurie Besikof always intended to have more than one person in the Leadership Group, and the record reflects that it usually did, except during the period after an employee quit or was fired and before that employee was replaced.  Kaufmann Dep. at 54-56, 167-68.

The record also reflects a third possible explanation for the disparity between Vick's and Darke's pay: a desire by the firm to save money.  Kaufmann told Cornman that Darke could not have Vick's compensation package "because of the economics of Predictive Index."  Cornman Dep. at 44.  Darke argues that the discrepancy between this cost-saving rationale given privately to Cornman and the anti-competitiveness rationale given publicly to Darke and then to the Court could lead a jury to find that Lurie Besikof's anti-competitiveness rationale is pretextual.  Pl. SJ Opp. at 25.

Darke may be right; perhaps Lurie Besikof's real reason for compensating Darke differently from Vick was to save money rather than to reduce intra-group competition.  This would render Lurie Besikof's anti-competitiveness rationale pretextual, but it cannot save Darke's claim, because Darke must point to evidence that creates an issue of fact as to whether

-18-

Lurie Besikof's proffered rationale is a pretext *for sex discrimination*. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 ("in our view 'pretext' means 'pretext for discrimination'"); *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005). Lurie Besikof did not violate Title VII by paying Darke less than Vick to save money, even if Lurie Besikof later lied about its reason for doing so, as long as Lurie Besikof did not cut Darke's pay relative to Vick's because she is a woman. And the record contains no admissible evidence to support a jury's conclusion that Lurie Besikof underpaid Darke because of her sex.[13]

## 2. Constructive Termination

Although Darke resigned from Lurie Besikof, she contends that her resignation was a response to actions by Lurie Besikof that amounted to constructive termination. An employee is constructively terminated only if (1) her working environment is objectively intolerable (i.e., intolerable to a reasonable person), and (2) either the employer intends to force the employee to quit, or it is reasonably foreseeable that the employer's actions would cause the employee to quit. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616-17 (8th Cir. 2007). No reasonable jury could find that Lurie Besikof intended to force Darke to quit or should have reasonably foreseen that she would do so; nor could any reasonable jury find that Darke's situation at the firm was objectively intolerable. Accordingly, Darke was not constructively

---

[13]Darke relies heavily on the affidavits of two former Lurie Besikof employees, Gina DeConcini and Tiffany Walz, to support her sex-discrimination claim. Lurie Besikof moves to strike both affidavits on the basis that they include inadmissible hearsay and are not made on personal knowledge. Def. Reply at 5-7. The Court agrees with Lurie Besikof that the two affidavits do not comply with Rule 56(e)(1) because they do not appear to be "made on personal knowledge," they do not "show that the affiant is competent to testify on the matters stated," and they consist largely of inadmissible hearsay. Fed. R. Civ. P. 56(e)(1). The affidavits are also filled with information that is irrelevant even if it is admissible. The Court has therefore entirely disregarded DeConcini's affidavit and has disregarded most of Walz's affidavit. (As noted elsewhere in this order, the Court has considered Walz's assertions about Stelljes's pay.)

discharged, and her sex-discrimination claim fails to the extent that it is based on her alleged

constructive discharge.

Darke makes much of the allegedly toxic work environment at Lurie Besikof.  Pl. SJ

Opp. at 12-13, 18-19, 23-24.  She has precious little admissible evidence on this point, though,

and what evidence she does have tends to show that one particular partner (Neil Lapidus) was

abusive to both men and women.  *See* Kaufmann Dep. at 126-29, 156-62.  Darke herself had few

interactions with Lapidus.  He berated her once at a restaurant, but that was in 2001 or 2002,

years before her alleged constructive termination.  Darke Dep. at 72-74.

Darke also relies heavily on her dissatisfaction with how Lurie Besikof handled her

appointment as a director and her refusal to sign a director's agreement.  Pl. SJ Opp. at 22 & n.7.

Darke was first offered a director's agreement in November 2004.  Kaufmann and Cornman

testified that Darke asked that the agreement be revised, and Darke has provided no evidence to

the contrary.  Kaufmann Dep. at 137-38, 145-47; Cornman Dep. at 46-47; Darke Dep. at 49

(sidestepping the question whether Darke raised concerns about the November 2004 agreement);

Darke Aff. ¶ 8.  Thus, the events surrounding the November 2004 agreement do not come

anywhere close to constructive termination.

In April 2005, Lurie Besikof presented Darke with a revised director's agreement that

was in some respects less favorable than the November 2004 agreement.  In the meantime, at

some point Kaufmann told Darke to bring her compensation-related complaints to Cornman

rather than to him, and Kaufmann criticized Darke for being greedy and not being a team player.

Darke Dep. at 50, 68-69, 106; Darke Aff. ¶ 13; Kaufmann Dep. at 112, 134-35.  According to

Darke — whose version of these facts is supported by admissible evidence and therefore

accepted by the Court — around the time she refused to sign the April 2005 agreement,

-20-

Cornman threatened her job in various ways:  He told Darke that she would be fired if she refused to sign the agreement, and after her refusal to sign, Cornman told her that she was demoted and stripped of her management duties and that the directorship offer was withdrawn.[14] Darke Dep. at 50-51, 56-57, 107-11; Darke Aff. ¶¶ 9-10.  Moreover, Darke had been told by Kaufmann that they intended to hire as the Leadership Group's second employee (i.e., for her old position) someone with skills comparable to Darke's, rather than someone more junior. Kaufmann Dep. at 153-55.

These events, standing alone, could have led Darke reasonably to wonder if Lurie Besikof intended to replace her.  But taken in context, these events did not create the type of intolerable conditions that equate to constructive termination.  After all, Kaufmann expressly disavowed Cornman's statements and reassured Darke that Lurie Besikof very much wanted her to stay on as President of the Leadership Group.  Kaufmann Dep. at 187-96; Darke Dep. at 51-54; Roback Aff. Ex. 10.  Further, Cornman himself emailed Darke to clarify that she was not being stripped of her management duties.[15]  Indeed, the day after Darke submitted her

---

[14]Darke also contends that she was in fact demoted, and not just threatened with demotion, as evidenced by her exclusion from management meetings and from interviews with potential Leadership Group employees.  Darke Aff. ¶ 12(e).  Darke cites no evidence that any management meetings occurred between the time she refused to sign the director's agreement and the time she resigned.  She also cites no evidence that she was excluded from job interviews. Although Darke asserts that Lurie Besikof "secretly began to interview [her] replacement in the firm during the last month of [her] employment with [Lurie Besikof]," she does not say how she learned of these "secret" interviews (Rule 56(e) requires this information), and she acknowledges that her (unsupported) assertion is contradicted by the (admissible) deposition testimony of Kaufmann and Cornman.  *Id.*

[15]After a conversation with Cornman, Darke sent him an email asking:  "Are you telling me that I am no longer managing the department (which I have managed for two years now) due to me not signing the Director's Agreement?"  Roback Aff. Ex. 9.  Cornman responded:  "The offer to serve in the role of a Firm Director has been withdrawn.  Any responsibilities you have had outside the scope of the Directorship remain in place."  *Id.*  Darke's management

resignation letter, Kaufmann asked her — in writing — to withdraw her resignation and remain

with Lurie Besikof.  Roback Aff. Ex. 12.  In light of all these circumstances, the undisputed facts

establish both that Darke's work environment was not objectively intolerable, and that Lurie

Besikof did not intend to force her to quit and should not have reasonably expected that she

would quit.  Accordingly, Darke was not constructively discharged.

### 3.  The Director's Agreements

Darke also argues that Lurie Besikof discriminated against her because of her sex in

connection with the director's agreements it asked her to sign.  Pl. SJ Opp. at 17, 22.  As the

Court understands this claim, Darke contends that she was offered a benefit (the title of director

and the associated directors-only retirement plan) that men were offered, but because she was a

woman, her receipt of that benefit was a subject to conditions more onerous than those imposed

on men for the same benefit.  Discriminating in this way in offering a benefit could, in theory, be

a prohibited adverse action.  The evidence in this case, however, does not support Darke's claim.

Darke has provided no evidence that similarly situated men were treated differently, and

thus she has not even made out a prima facie case with respect to the director's agreement.

Moreover, at least some aspects of the director's agreement were customized for her job alone, at

her request.  Kaufmann Dep. at 137-38, 145-47; Cornman Dep. at 46-47; Darke Dep. at 49;

Darke Aff. ¶ 8.  As to those aspects of the agreement, she has no chance of showing that Lurie

Besikof's explanation for the changes — that they were tailored to her job, and that she asked for

them — was a pretext for discrimination.

---

responsibilities were "outside the scope of the Directorship," as evidenced by the fact that she
managed the Leadership Group for two years without being a director.

Darke's entire argument about the director's agreement rests on a single comparator: Nicholas Hugunin, a male director who, says Darke, was allowed to become a director without signing a director's agreement, and who was not punished for failing to sign it immediately. Pl. SJ Opp. at 28-29; Walz Aff. at ¶ 5. But Darke has no admissible evidence to support her assertions about Hugunin. Walz, a onetime human-resources manager at Lurie Besikof, asserts in her affidavit that Hugunin "was not required to sign a Directors Agreement as a condition of being offered a directorship." Walz Aff. at ¶ 5. But Walz's affidavit does not "show that [Walz] is competent to testify" on this point. Fed. R. Civ. P. 56(e)(1). Indeed, it appears that Walz may *not* be competent to testify on this point: She was Lurie Besikof's human-resources manager until June 2002, but Hugunin's director's agreement was not executed until July 25, 2002. Walz Aff. ¶ 2; Roback Supp. Aff. Ex. 2 at DEF-1225 [Docket No. 34].

The only admissible evidence as to Hugunin's directorship comes from Kaufmann, who said that Hugunin was not required to sign the director's agreement, but also was not made a director until he did so. Kaufmann Dep. at 143 ("Mr. Hugunin has signed the director's agreement. He didn't sign it the first year we presented it to him. He was not demoted. He was not given the title of director, either."). According to Kaufmann, Darke had the exact same choice as Hugunin — sign the director's agreement and get its benefits, or decline to sign it and forgo its benefits — and Kaufmann disavowed any contrary statements that Cornman may have made. Kaufmann Dep. at 152, 191-92, 195; Darke Dep. at 51-54.

Further, Darke cannot show that she and Hugunin were similarly situated, even at the pretext stage. Indeed, in at least two respects, they were plainly *not* similarly situated: First, Hugunin signed his director's agreement in 2002, while Darke was first offered a directorship in 2004. Second, Hugunin was not a commissioned salesperson like Darke. In light of these

differences, no inference of discrimination flows from the fact that in 2002, Hugunin's director's agreement had a requirement that he work 1750 "chargeable hours" per year, Roback Supp. Aff. Ex. 2 at DEF-1226,  whereas Darke's agreements specified that she was "expected to work a minimum of" either 2080 hours (in the November 2004 agreement) or 2280 hours (in the April 2005 agreement) per year.  Darke Aff. Ex. 6 at PD0423, Ex. 7 at PD0432.  Although Hugunin could count certain specially designated nonbillable hours toward his 1750-hour requirement, anyone who has worked in a law firm knows that, to achieve 1750 *chargeable* hours, Hugunin would have to work a lot more than 1750 hours.  It is thus not even clear that Hugunin's annual-hours requirement was lower than the requirement in Darke's agreements, which referred to hours *worked* rather than to hours *chargeable*.

As noted, Lurie Besikof increased the work-hours requirement in the director's agreement it presented to Darke by 200 hours between November 2004 and April 2005 — from 2080 hours to 2280 hours — which is a significant change.  But Darke cannot show that she was treated differently from any similarly situated man — or that she would have been treated differently if she had been a man.  Indeed, the only evidence in the record on this changed hours requirement is that 2280 hours is the same annual-hours requirement imposed on directors in the tax department.  Darke Dep. at 50.  Darke simply has no evidence that Lurie Besikof discriminated against her based on sex when the firm demanded in April 2005 that she work 2280 hours a year to get the benefits of a directorship.

Nor can other changes in the April 2005 agreement form the basis of a sex-discrimination claim.  It is apparent from the face of the November 2004 agreement that it was not suited to her position as a commissioned salesperson, and Darke does not deny having pointed this out to

Kaufmann.[16]  *See* Kaufmann Dep. at 137-38, 145-47; Cornman Dep. at 46-47; Darke Dep. at 49.
The noncompete clause in the agreement was changed from November 2004 to April 2005, and
the changes were largely driven by the nature of Darke's position.[17]  They therefore cannot be
attributed to sex discrimination.

### D.  Retaliation

Darke also contends that Lurie Besikof retaliated against her for complaining of sex
discrimination.  Such retaliation is prohibited by both Title VII and the MHRA.  42 U.S.C.
§ 2000e-3(a); Minn. Stat. § 363A.15(1).

Although there is evidence that Darke complained incessantly about her *pay*, there is
almost no evidence that she ever complained about *sex discrimination*.  The nearest thing to such
evidence is Darke's claim that she complained to Lurie Besikof that she was paid less than her
"male predecessor."  Darke Dep. at 79.  The Court will assume that Darke indeed phrased her
complaints this way (although it would not be surprising if Darke started using the term "male
predecessor" only after the fact, during this litigation).  Her retaliation claims nonetheless fail.

---

[16]For instance, a director's retirement earnings (i.e., deferred compensation) are based on
the director's average salary during a three-year period.  Darke Aff. Ex. 6 at PD0425.  But
"salary" is defined in the November 2004 agreement to "not include any commissions . . . ."  *Id.*
This definition is manifestly unsuited to Darke, who was a commissioned salesperson, unlike all
Lurie Besikof employees outside of the Leadership Group.  *See* Kaufmann Dep. at 124.

[17]For instance, the noncompete clause in the November 2004 agreement specifies that the
director will not "[p]ractice public accounting in any county in which [Lurie Besikof] maintained
an office on the date [the director] ceased to be employed by [Lurie Besikof]."  Darke Aff. Ex. 6
at PD0429.  This is not much of a noncompete clause for someone like Darke, who does not
practice public accounting.  The April 2005 agreement specifies instead that Darke will not
"Practice Management Advisory Services in any county in which [Lurie Besikof] maintained an
office on the date she ceased to be employed by [Lurie Besikof]."  Darke Aff. Ex. 7 at PD0437.

To establish a prima facie case of retaliation in a discrimination case, an employee must show (1) that she complained of discrimination, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the complaint and the adverse action. *See Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005). If an employee establishes a prima facie case, the employer has a burden of production to come forward with a legitimate, non-retaliatory reason for the challenged adverse action. *Id.* The burden then shifts back to the employee to show that the proffered reason is a pretext for retaliation. *Id.*

Darke fails to make out a prima facie case of retaliation because she cannot show the requisite connection between her complaint that she was paid less than her "male predecessors" and any adverse action. Darke's retaliation claims also fail because she cannot show that Lurie Besikof's proffered reasons for its actions are a pretext for retaliation.

The Court has already explained that Darke was not constructively discharged. She therefore cannot base her retaliation claim on her constructive-discharge allegations (i.e., her allegations that she was demoted, threatened with termination, and stripped of her management duties) because those allegations do not amount to adverse employment action.

As for the changes to the director's agreement between November 2004 and April 2005, no reasonable jury could conclude that they were made to retaliate against Darke for complaints of sex discrimination. First, by all accounts, Darke never stopped complaining about being underpaid. Yet the director's agreement was not changed until April 2005, almost two years after she took over for Vick and began complaining that she wanted Vick's compensation package, and almost five years after she took over for Stelljes and began complaining that she should be paid more. Too much time passed between Darke's complaints and the changes in the director's agreement for a jury to conclude that the changes were connected to her complaints,

and thus Darke cannot make out a prima facie case with respect to the changes to the director's agreement. *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005) (holding that although "*close* temporal proximity" between protected conduct and adverse action may give rise to an inference of discrimination, "generally, more than a temporal connection . . . is required") (emphasis added; quotations omitted).  Moreover, as noted above, Darke has not presented evidence sufficient to create a jury issue as to whether Lurie Besikof's explanation for the changes was pretextual.

Finally, Darke's pay-discrimination allegations cannot be the basis for her retaliation claims.  First, whether Darke is alleging that discrimination or retaliation resulted in her being underpaid, her pay-related claims are untimely under *Ledbetter*, as explained above.  Second, no reasonable jury could find a causal connection between Darke's complaints about her pay relative to Stelljes and her later promotion to Vick's position at an allegedly unfair pay rate; the temporal gap is just too wide.  Nor could any reasonable jury find that Lurie Besikof's explanations for Darke's compensation in Vick's position were a pretext for retaliation, for reasons already given.  And Darke's complaints about her pay relative to Vick cannot be causally connected to her alleged underpayment in Vick's position because the underpayment came *before* the complaints about the underpayment.  Darke's retaliation claims therefore fail.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Defendant's motion for summary judgment [Docket No. 11] is GRANTED.

2.      Plaintiff's complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February _7_, 2008                    s/Patrick J. Schiltz_____
                                              Patrick J. Schiltz
                                              United States District Judge